**In re PLEASANT EAST ASSOCIATES, Debtors.**

No. 00–14524 (REG).

United States Bankruptcy Court, S.D. New York.

April 22, 2002.

**510**

Parker, Duryee, Rosoff & Haft, by Arnold Spellun, and Marilyn Simon & Associates, by Marilyn Simon, New York City, for Debtor.

United States Attorney's Office, by Edward Chang, New York City, for United States of America.

Carolyn S. Schwartz, by Wendy Rosenthal, New York City, for United States Trustee.

## DECISION ON MOTION TO DISMISS CHAPTER 11 CASE

ROBERT E. GERBER, Bankruptcy Judge.

In this contested matter in a case under chapter 11 of the Bankruptcy Code, commenced by Pleasant East Associates ("the Debtor"), the United States Department of Housing and Urban Development ("HUD"), moves, pursuant to Bankruptcy Code section 1112(b), to dismiss the case for "cause," and in particular for bad faith filing.

As described more fully below, the Court finds that the petition was filed in good faith, but also finds that all of the factors identified by the Second Circuit[1] as justifying dismissal for cause, by reason of bad faith filing, are present here. These would normally present an overwhelming showing of "cause" for dismissing the case, and the seeming inconsistency of the Court's conclusions at the outset of this paragraph results only from the

---

**1.** *See In re C–TC 9th Avenue Partnership,* 113 F.3d 1304 (2d Cir.1997) *("C–TC "),* discussed at length below.

issue, as stated eloquently by Debtor's counsel, as to whether "HUD can[ ] be permitted to cause the financial failure of the Debtor and then seek to dismiss the case because of that failure." [2]  A decision in the Debtor's favor with respect to the merits of that issue could provide a basis for the Debtor to reorganize.  However, for the reasons set forth below, this Court believes that any Debtor–HUD litigation in this regard should be heard in the district court.  The Court is willing to allow this case to live a little bit longer to provide an opportunity for the Debtor, if it is so advised, to seek and obtain relief there, assuming that the Debtor acts diligently and appropriately to secure it.

Accordingly, HUD's motion is granted, but with the effectiveness of the resulting dismissal stayed for 30 days.  If, within 30 days of the date of entry of the order implementing this decision, the Debtor commences an action in the district court seeking relief with respect to its claims against HUD, the stay will continue (and thus this case will not be dismissed) pending further order of this Court, without prejudice to HUD's rights to vacate the stay (and thus obtain dismissal) if (a) HUD prevails in any such district court action; (b) the district court action is dismissed or discontinued for any reason;  or (c) the district court issues any ruling from which it fairly can be concluded that the Debtor lacks a reasonable likelihood of success.

The following are the Court's findings of fact, conclusions of law, and bases for the exercise of its discretion in connection with HUD's motion.

*Facts*

Pleasant East Associates ("the Debtor") is the owner of the Pleasant East Apartments (the "Apartments")—federally subsidized low-income housing—in the East Harlem section of Manhattan, New York City. The Debtor's managing general partner is Pleasant East Renewal Corp., whose president, in turn, is Albert Medina.[3]  The Apartments were renovated in 1976 with financing provided by the Debtor's partners.[4]  Additional financing was provided by Citibank, secured by a mortgage (the "Mortgage") in the approximate amount of $3,500,000.  The United States Department of Housing and Urban Development ("HUD") guarantied the Citibank loan, and, prior to May 1999, provided "Section 8" housing subsidies for the "Apartments." [5]  The subsidies were provided in accordance with a "Regulatory Agreement" and two Section 8 Housing Assistance Payment Contracts (the "Assistance Contracts").[6]

Starting in May 1999, HUD ceased payment of the housing subsidies based on its view that there were failures on the part of the Debtor to satisfy various regulatory and contractual requirements.  On August 29, 2000, HUD sent a "Notice of Default and Foreclosure and Sale" to the Debtor, and on September 26, 2000, the Debtor filed this chapter 11 case.

The Regulatory Agreement required, in relevant part, that the Debtor:

—maintain the Apartments "in good repair and condition";

—obtain certifications (and recertifications) of tenant income at periodic intervals;

---

**2.**  Debtor Br. at 6.

**3.**  Affidavit of Albert Medina ("Medina Aff.") ¶ 1.

**4.**  *See* Medina Aff. ¶ 5.

**5.**  *See* Medina Aff. ¶ 6;  Declaration of Deborah Van Amerongen (Van Amerongen Decl.) ¶ 3.

**6.**  Van Amerongen Decl. ¶¶ 2, 3, 6.

—"use the dwelling accommodations of the project only for the use which was originally intended"; and

—refrain from distributing project assets or income except as specifically permitted.[7]

The Assistance Contracts further required the Debtor to warrant that the units in the Apartments were "in decent, safe and sanitary condition."[8] The Mortgage incorporated the Regulatory Agreement by reference, and provided that "[u]pon default under the Regulatory Agreement ... the Mortgagee, at its option, may declare the whole of the indebtedness secured hereby to be due and payable."[9]

In September 1996, HUD conducted a "Comprehensive Management Review" with respect to the Apartments, evaluating the Debtor's management of the Apartments with respect to maintenance and security, financial management, leasing and occupancy, tenant-management relations, the absence of drugs, and general management practices.[10] The resulting Management Review Report (the "1996 HUD Report") identified numerous problems with the Debtor's management of the Apartments, including: (1) the failure to maintain the Apartments in decent, safe and sanitary condition; (2) the misuse of project income and assets; (3) the failure to file financial statements timely, if at all; and (4) the failure to properly certify and recertify tenant incomes.[11] From HUD's perspective, between 1996 and 1999, when HUD terminated the Section 8 subsidies,

those problems were not addressed, and indeed worsened.

However, the Debtor's perspective is different. As stated by Mr. Medina in his affidavit, HUD was supposed to closely supervise the general contractor for the renovation of the Apartments, but was grossly negligent in its supervision, and failed to ensure that proper materials were used for the renovations. The alleged failures on HUD's part caused maintenance deficiencies for 24 years.[12] HUD would not authorize an increase in rent for six years (beginning in 1989) by reason of the maintenance issues,[13] and by withholding funds from the Debtor for major repairs and replacement in 1994 (to which the Debtor contends it was entitled pursuant to the Debtor's Reserve Fund for Replacement), HUD caused the Debtor's working capital to be compromised, making further repairs very difficult.[14] This, the Debtor contends, led to continued deterioration of the Apartments.

HUD again inspected the Apartments on May 6, 1999. It noted many of the same problems that had been identified three years earlier in the 1996 HUD Report, and a fair number of what it considered to be life-threatening conditions.[15]

The Debtor proposed a "Management Improvement and Operating Plan," attempting to address some of the Apartments' physical and financial needs. However, at least from HUD's perspective, the plan was not adequately funded and did

---

7. *Id.* at ¶ 4.

8. *Id.* at ¶ 6.

9. Mortgage ¶ 3.

10. Van Amerongen Decl. ¶ 9.

11. *Id.*

12. Medina Aff. ¶¶ 11–16.

13. *Id.* at ¶ 17.

14. *Id.* at ¶¶ 19, 21.

15. Van Amerongen Decl. ¶ 16.

not address all of the Apartment's critical needs.[16]

The Debtor failed to make any mortgage payments after April 1999, and as a result its mortgage was assigned to HUD, as guarantor, in August 1999. In October 1999, HUD issued a "Notice of Violation of Regulatory Agreement, Note, Mortgage and Housing Assistance Payments Contract," setting forth numerous grounds for finding the Debtor in default, most of which, HUD contends, had been foreshadowed in the 1996 HUD Report. The letter warned that HUD would proceed with foreclosure if the Debtor failed to cure all physical and financial deficiencies within 30 days.[17]

On February 9, 2000 HUD and the Debtor entered into a Mortgagee–in–Possession Agreement, whereby HUD took possession of the Apartments. After it did so, HUD prepared an estimate of what it believed to be the repair requirements, estimating that the Apartments required over $6.4 million in repair work.[18] HUD provided another notice of its intent to foreclose (providing the Debtor with the "opportunity to show reasons why foreclosure should not take place"), but the Debtor did not respond, and by letter dated February 23, 2000, HUD provided notice that it was initiating foreclosure.[19]

As previously noted, on August 29, 2000, HUD sent a "Notice of Default and Foreclosure and Sale" to the Debtor, and on September 26, 2000 (the "Petition Date"), the Debtor filed this chapter 11 case.

After having taken possession of the Apartments in February 2000, HUD is currently operating them. It does so with the assistance of a managing agent, Arco Management ("Arco").[20] The Debtor has lacked the ability to report on its financial affairs without the assistance of Arco, as it has been Arco alone who had the day-to-day control over the Apartments and their finances.

Plainly the Debtor believes that its difficulties have been the result of failures on the part of HUD, and of regulatory actions on HUD's part that have made the conditions in the Apartments worse. The Debtor's factual contentions in this regard have been supported by affidavit, executed by Mr. Medina, in considerable detail. Likewise, the Debtor's legal contentions in this regard are based, at least in part, on caselaw at the court of appeals level,[21] though HUD presumably will contend *Christopher Village* is inapposite.

---

16. *Id.* at ¶ 18.

17. *Id.* at ¶¶ 40–41.

18. *Id.* at ¶¶ 38, 19.

19. *Id.* at ¶¶ 42, 43.

20. 5/11/01 Section 341 Mtg. Tr. at 5.

21. *See Christopher Village, Ltd. Partnership. v. Retsinas*, 190 F.3d 310 (5th Cir.1999). The Fifth Circuit there stated, in relevant part:

> Village certainly had the duty to maintain Mockingbird "so as to provide decent, safe and sanitary housing.... Village's duty, however, was not absolute. Nothing in the National Housing Act, HUD's regulations, the Regulatory Agreement, or the HAP requires Village, as a low income property owner, to absorb or subsidize operating and maintenance deficiencies. Instead the programs are designed to ensure that HUD establishes rental rates so that property owners receive enough revenue to cover all of the property's expenses including maintenance, repairs, debt service, taxes, and a six percent return on investment." *See* 12 U.S.C.A. § 1747c. Thus, the HUD reimbursement scheme resembles cost-plus contracts or public utility regulation, in either of which situations the private party who performs the work is assured of recovering reasonably incurred costs as well as a reasonable return on investments.

190 F.3d at 316.

An element of the Debtor's strategy, having brought this case here (and, conceivably, having brought this case here for this exact purpose) is to have this Court—a bankruptcy court—decide the disputed issues. At oral argument, counsel for the Debtor stated:

> [W]e do believe that this Court has jurisdiction to determine the underlying facts that are in dispute between us and HUD and that it would not be judicially convenient to have two actions going, an action in this Court and an action in the Federal Court.[22]

However, at no time prior to the filing of its bankruptcy case did the Debtor commence any litigation against HUD with respect to HUD's dealings with the Debtor or the Apartments. Nor, in the period from the September 2000 Petition Date to the July 2001 time of filing of HUD's dismissal motion, did the Debtor do so, or announce, at least in any concrete way, its intention to do so.[23] The Debtor has not brought any litigation against HUD in the district court, and while the Debtor has stated that it would ask this Court—a bankruptcy court—to rule on the merits of its dispute with HUD (and has submitted a supplemental brief with respect to the power of this Court to entertain such a controversy), the Debtor has not yet commenced any such action.

It is plain, and the Court finds, that the Debtor has no chance of reorganizing without prevailing over HUD in the district court. Without the Section 8 subsidies, the Debtor's liabilities increase at the rate of $200,000 to $400,000 each month.[24]

Without the Section 8 subsidies, the Debtor cannot reestablish a stable financial basis with which to finance a reorganization plan. Thus the Debtor's hopes for reorganizing rest entirely on success in a litigation with HUD.

The Court also makes the following findings, with respect to matters relevant to determinations on matters of this character under *C–TC*:

(1) While the Apartments are on separate parcels, they are in substance a single asset; the Court finds that the Debtor has a single asset.

(2) The amount owed to HUD exceeds $6.5 million.[25] Aside from the Debtor's tenants (who are creditors by reason of claims they might have by reason of failures to provide them with services, but who have been scheduled as having unliquidated claims in the amount of "0.00"), there are only 5 unsecured creditors in the present case, and their claims total $76,751.[26] The Court finds that the Debtor has few unsecured creditors, whose claims are small in relation to those of the secured creditor HUD.

(3) HUD announced its intent to commence foreclosure proceedings on August 29, 2000. While the Debtor's chapter 11 filing came sufficiently quickly to precede the actual filing of a foreclosure proceeding, the Court finds that the Debtor's one asset is in substance the subject of a foreclosure action as a result of arrearages or default on the debt.

---

**22.** Hrg. Tr. at 35.

**23.** The Court understands, after having been so advised in Section 105(d) case management conferences, that there may have been settlement or other negotiations ongoing between the Debtor and HUD during some portion of this time.

**24.** Van Amerongen Decl. Exh. M.

**25.** Van Amerongen Decl. ¶ 39.

**26.** *See* Schedule F, Creditors Holding Unsecured Nonpriority Claims (Docket No. 20).

(4) The Debtor's counsel acknowledged that "[a] dispute between management of the debtor and HUD clearly had arisen at a certain point.... This case is about the relationship between debtor and HUD and the action taken by HUD in connection with this property. The debtor's position, obviously, is that HUD had acted improperly when it terminated the subsidies and also failed to and refused to pay for the cost of repairing the properties to bring them up in standards, and also failed to and refused to tell debtor or document deficiencies of the property so that those deficiencies could be dealt with." The Court finds that the Debtor's financial condition is, in essence, a two party dispute between the Debtor and its secured creditor HUD; the Court has an insufficient record to make a finding as to whether or not this dispute could be adjudicated in a foreclosure action brought by HUD, but the Court believes that the controversy can be heard in a district court.

(5) The Debtor filed its chapter 11 case 28 days after HUD announced its intention to foreclose. The Court finds that the timing of the Debtor's filing evidences an intent to delay legitimate rights of the Debtor's secured creditor HUD to enforce its rights.

(6) The Debtor is no longer in possession, and has no revenues. The Court finds that the Debtor has little or no cash flow.

(7) The Apartments generate negative cash flow in the absence of section 8 subsidies, which HUD has withdrawn. The Debtor cannot meet current expenses.

(8) The Debtor had a few employees, but they are now acting for Arco, and more significantly, the desirability of saving employee jobs, which is an important goal in chapter 11 cases generally, is not a factor here.[27] The Court finds that for the purposes of any C–TC analysis, the Debtor has no employees.

### Discussion

HUD contends that the Debtor's petition "was not filed in good faith,"[28] requiring its dismissal. In connection with that, HUD contends that the Debtor has no prospect for a successful reorganization without Section 8 subsidies from HUD, and achieving this goal would require the Debtor first to prevail in plenary litigation in the Debtor's two-party dispute with HUD. Put another way, HUD contends that the Debtor's ability to reorganize depends wholly on the success of the Debtor's lawsuit against HUD, which has not yet been commenced and which would require determination of that matter. Moreover, the Government argues, any claims by the Debtor against HUD would have to be adjudicated by the district court and could not be resolved as a core proceeding by an Article I bankruptcy judge.[29]

The Debtor contends, by contrast, that it has the ability to rehabilitate, and that it filed its chapter 11 case in good faith. It argues that dismissal under section 1112(b) is discretionary and not mandatory, and that accordingly the court may decline to dismiss even in the presence of cause. In this connection, the Debtor contends that the Court should focus on the needs and concerns of all creditors, not just HUD, and that this necessarily requires focusing on the needs of the tenants—who, the Debtor notes, are creditors too. Most sig-

---

27.   1/5/01 341 Mtg. Tr. at 39.

28.   HUD Br. at 13.

29.   HUD Supp. Br. at 5.

nificantly, the Debtor contends that "HUD cannot be permitted to cause the financial failure of the Debtor and then seek to dismiss the case because of that failure."[30]

## I.

Bankruptcy Code section 1112(b) provides, in relevant part:

> Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for *cause* . . .

11 U.S.C. § 1112(b) (emphasis added).

It is well established that determinations whether to dismiss or convert are within the discretion of the Court. *See, e.g., In re Woodbrook Associates,* 19 F.3d 312, 316 (7th Cir.1994); *In re Syndicom Corp.,* 268 B.R. 26, 43 (Bankr.S.D.N.Y.2001) (Gerber, J.).

While section 1112(b) states that the authority it provides—dismissal or conversion—may be granted for "cause," and lists one or more examples of cause, it precedes the list with the word "includes," and the list is not exhaustive. "Cause" for either dismissal or conversion[31] may be found based on unenumerated factors, including "bad faith." *See C–TC,* 113 F.3d at 1313.

Over the years, a number of factors have been identified which may be indicative of a bad faith filing, and whose presence, or absence, has regularly been considered:

(1) the debtor has only one asset;

(2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4) the debtor's* financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6) the debtor has little or no cash flow;

(7) the debtor cannot meet current expenses including the payment of personal property and real estate taxes; and

(8) the debtor has no employees.

*C–TC,* 113 F.3d at 1311 (citing *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.,* 139 B.R. 828, 832 (W.D.Ky. 1992)).

■ Examining those factors, all are present here. As the Court has found as facts:

(1) While the Apartments are on separate parcels, they are in substance a single asset;

(2) The Debtor has few unsecured creditors, whose claims are small in relation to those of the secured creditor HUD;

(3) The Debtor's one asset is in substance the subject of a foreclosure action

---

**30.** Debtor Br. at 6.

**31.** While the Court mentions conversion here because section 1112(b) does, the Court will not mention it again; HUD does not contend that conversion is appropriate, and of course the Debtor does not contend that either.

as a result of arrearages or default on the debt;

(4) The Debtor's financial condition is, in essence, a two party dispute between the Debtor and its secured creditor HUD, which—whether or not it can be adjudicated in any foreclosure action HUD might bring—can be litigated somewhere else;

(5) The timing of the Debtor's filing evidences an intent to delay legitimate rights of the Debtor's secured creditor HUD to enforce its rights;

(6) The Debtor has little or no cash flow;

(7) The Debtor cannot meet current expenses; and

(8) The desirability of saving employee jobs, which is an important goal in chapter 11 cases generally, is not a factor here, as the Debtor has no employees.

Thus, as noted at the outset, all of the factors identified in *C–TC* as justifying dismissal for cause, by reason of bad faith filing, are present here,[32] and in the absence of more would warrant dismissal for cause, as a bad faith filing.

However, here the facts do show something more—a situation where, from the Debtor's perspective, its lack of cash flow, and inability to reorganize, is as a consequence of HUD's action, and in particular, HUD's failure to provide subsidies and/or authorize rent increases that HUD was required by law to do.[33] The true facts, are, of course, hotly contested. And while the affidavits suggest that each of the parties has the ability to make points with respect to failures on the part of the other, this Court is not in a position to make any more of a determination than that with respect to their controversy—both by reason of the inherent limitations on the issues that properly can be considered in a contested matter of this nature, and for the reasons discussed in Part II below.

The bona fides of the dispute are plainly sufficient, however, for the Court to conclude that it does not wish to say that the Debtor's bankruptcy filing, seeking to avoid a forfeiture pending resolution of the dispute with HUD, was "in bad faith."[34]

*II.*

Assuming (as the Court does for the purpose of this analysis) that the Debtor may have claims against HUD, the Court then must consider whether, as the Debtor contemplated, those claims should be heard in the bankruptcy court. After consideration of the supplemental briefs filed by the parties with respect to that issue, the Court concludes that assuming

---

**32.** As HUD properly points out (HUD Supp. Br. at 1), the Debtor did not address *C–TC* in its opposition to HUD's motion, and while the Court ordered supplemental briefing to permit the Debtor to address the issue, the Debtor's supplemental brief did not do so either.

**33.** Of course, from HUD's perspective, the blame lies at the feet of the Debtor.

**34.** HUD appropriately points out (HUD Supp. Br. at 2) that in an earlier case this Court stated that "[n]either malice nor actual fraud is required to find a lack of good faith." *See Syndicom*, 268 B.R. at 49. Likewise, "bad faith" filing does not itself mean bad mind or malicious activity. *Id.* Nevertheless, since the time this Court issued its decision in *Syndicom*, the Court has preferred to save the expression "bad faith" for the most egregious cases, like *Syndicom*, and has preferred simply to say that the Court has found "cause" for dismissal where the *C–TC* factors were present but the filing was more justifiable. *See, e.g., In re AMC Realty Corp.*, 270 B.R. 132, 147 ("Thus, in applying *C–TC*, I dismiss this case as a consequence of the application of the *C–TC* factors, but based on non-enumerated 'cause' for dismissal," *citing In re Head*, 223 B.R. 648, 653 (Bankr.W.D.N.Y. 1998) (Kaplan, C.J.) (dismissing chapter 11 and 13 cases for "non-enumerated" cause)).

that those claims could be heard in the bankruptcy court, they should not be heard here.

As HUD and the Debtor seemingly agree, the problem is not one of subject matter jurisdiction.[35] The statutory provision conferring subject matter jurisdiction with respect to bankruptcy related matters on the district courts (and hence the bankruptcy courts), 28 U.S.C. § 1334, confers subject matter jurisdiction with respect to matters "relating to" cases under title 11. At least as a general matter, it covers matters where the estate will be pecuniarily affected by the dispute in question, as this dispute would. However, where, as here, the estate wishes to have the matter heard by an Article I bankruptcy judge, the estate must also show that the dispute is a core matter that an Article I bankruptcy judge *can* decide, and, if so, whether it is one that a bankruptcy judge *should* decide. *See* 28 U.S.C. § 157.

Though the claims that the Debtor would assert have not yet been laid out in a complaint, the oral and written argument has given the Court some sense of the matters the Debtor would wish to litigate. *Christopher Village* suggests that at least some of the matters of which the Debtor complains might be matters committed to HUD's discretion, and/or be unreviewable by any court, but that others may be heard. However, the contours of the deci-

sion as to reviewability, and as to the rights of an aggrieved operator of low income housing on the merits, will turn not on issues of bankruptcy law, but rather, on interpretations of the federal legislation relating to subsidized housing, the National Housing Act, 12 U.S.C. § 1701 et seq., and the United States Housing Act of 1937, 42 U.S.C. § 1437 et seq., the regulations thereunder, and, insofar as agency determinations are to be subjected to judicial review, the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq. and 701 et seq. While bankruptcy judges can and do work with a wide array of federal nonbankruptcy statutes, and certainly are free to apply and construe nonbankruptcy law, they first consider the course upon which they are asked to embark when complex mixed questions of fact and law, and/or important questions of nonbankruptcy policy, may be involved.

The Debtor argues that HUD has filed a proof of claim, and hence is subject to the Court's jurisdiction, but this is not disputed by HUD. It also may be the case that at least in the first instance, by reason of HUD's having filed a proof of claim or otherwise,[36] claims by the Debtor against HUD might be a core matter.[37] But HUD observes [38] that regardless of whether the proceeding is core or non-core, the district court would be required to withdraw the proceeding on motion because the proceed-

---

**35.** Nor is it a problem of sovereign immunity. HUD has disclaimed reliance on that as a defense. *See* HUD. Supp. Br. at 8 ("The debtor's arguments regarding sovereign immunity and jurisdiction are irrelevant; the Government has never asserted those defenses").

**36.** The Court notes, in passing, that it is uncomfortable HUD's definition of a non-core matter—one that "that would have no existence outside of the bankruptcy case." (HUD Supp. Br. at 7). While there is law in other jurisdictions supporting such a broad pro-

nouncement, this Court believes it to be inconsistent with the law in the Second Circuit. *See In re Reliance Group Holdings, Inc.,* 273 B.R. 374, 392 & n. 31 (Bankr.E.D.Pa.2002); *PSINet, Inc. v. Cisco Systems Capital Corp. (In re PSINet, Inc.),* 271 B.R. 1, 29 (Bankr. S.D.N.Y.2001) (Gerber, J.) (in each case discussing law in Second Circuit and others).

**37.** The Court expressly does not determine this, however.

**38.** HUD. Supp. Br. at 9.

ing would involve consideration of "other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).[39]

While the Debtor correctly observes that HUD has not yet asked for a withdrawal of the reference,[40] it is also the case that up to this point, HUD has had no occasion to do so.[41] The Debtor has not yet initiated the proceeding involving non-bankruptcy federal law that would provide the basis for mandatory withdrawal.[42] But other than noting that there has yet been no request for withdrawal of the reference, the Debtor has not responded to HUD's point under 28 U.S.C. § 157(d).

To be sure, § 157(d) provides that the *district court* shall withdraw the reference when matters relating to non-bankruptcy federal law are involved, which might suggest that this Court nevertheless take jurisdiction and then wait for district court action. But here we do not have a situation where the issue is solely one of statutory construction, and/or whether a federal statute applies or not. Over the objection of HUD, having expressly raised 28 U.S.C. § 157(d), we have a request that this Court get immersed in a lengthy non-bankruptcy litigation involving both mixed questions of fact and law and, at least in material respects, judicial review of administrative discretion—when the agency in question's exercise of its discretion involved its consideration of issues of non-bankruptcy policy. In this Court's view, a bankruptcy court is not required to assume jurisdiction over such a matter, and, assuming that it can take jurisdiction, it does so in the exercise of its discretion. This Court declines to exercise any discretion that it has in that fashion.

Accordingly, this Court believes that it is not the appropriate forum to hear any claims that the Debtor wishes to assert against HUD.

### III.

As noted above, this chapter 11 case meets all of the *C–TC* standards for dismissal for cause, and this Court believes that, even assuming, arguendo, that this Court could take jurisdiction over any upcoming Debtor–HUD litigation, this Court should not do so.

However, as the Debtor's points do not appear to be frivolous, and the Court is here comfortable, on the particular facts of this case, that the Debtor has acted responsibly, this Court is loath to deny the Debtor its day in court in the appropriate forum—the district court—if the Debtor wishes to assert its claims against HUD.

---

39. That section provides:
   The district court *may* withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court *shall*, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.
   (Emphasis added).

40. Debtor Supp. Br. at 7.

41. Also, the Debtor goes on to say that "[a]ccordingly, under 28 U.S.C. § 1334(b), the Bankruptcy Court continues to have subject matter jurisdiction of all civil proceedings arising in or related to the pending Chapter 11 case." *Id.* This confuses subject matter jurisdiction over the controversy (which both district courts and bankruptcy courts would have, and which HUD does not question), and the power of an Article I bankruptcy judge to decide it (which 28 U.S.C. § 157, and not § 1334, determines).

42. Likewise, a request for discretionary withdrawal based on issues that had not yet been raised, and might never be, might well raise ripeness issues.

Dismissing this case immediately might have the effect of denying the Debtor that opportunity.

If the litigation against HUD is not timely commenced by the Debtor, dismissal of this bankruptcy case under *C–TC* will plainly be appropriate, and dismissal of this bankruptcy case will likewise be appropriate if the Debtor ultimately is not successful in its plenary litigation, or discontinues it. But the balance of hardships [43] is such that the Court is of the mind to allow a modest time—30 days, subject to reasonable extension for cause shown—for the Debtor to bring an action in the district court, if it is of a mind to do so. The Court believes that there is room under C–TC for the Court to allow a case to survive where, as here, the Debtor has not acted abusively and is asserting colorable claims in another forum which, if it is successful, may provide a basis for it to reorganize.[44]

HUD is to settle an order on notice to the Debtor implementing this decision, from which each party may, of course, appeal or cross-appeal. The Court wishes to emphasize that the time to appeal the resulting order will run from the date of its entry, and not from any later time that the dismissal becomes effective.

---

**43.** *I.e.,* the burdens of incremental delay in foreclosure on the part of HUD when HUD already has possession of the Apartments, and the Apartments already are being operated under HUD supervision, versus the loss, forever, of the entirety of the Debtor's interest in the Apartments, and the loss of any remedy other than damages for the loss of the Debtor's business.

**44.** Needless to say, the decision not to simply dismiss this case is based on its particular facts, *e.g.,* the Debtor's ability to argue the implications of *Christopher Village.* It cannot and should not be regarded as a view by this Court that simply raising litigation threats provides a basis for filings that would otherwise be dismissed under *C–TC.*