**In re CENTURY/ML CABLE VENTURE, Debtor.**

**No. 02–14838(REG).**

United States Bankruptcy Court, S.D. New York.

April 21, 2003.

---

Proskauer Rose LLP, by Bradley I. Ruskin, Esq., John W. Ritchie, Esq., Jeffery W. Levitan, Esq., Karen Coombs, Esq., New York City, for Creditor Joint Venture Partner ML Media Partners, LP.

Willkie Farr & Gallagher, by Roger D. Netzer, Esq., Michael W. Leahy, Esq., New York City, for Adelphia Communica-

tion Corp. and Joint Venture Partner Century Communications Corp.

Daniel J. Aaron, P.C., by Daniel J. Aaron, Esq., New York City, for Debtor.

*DECISION AND ORDER ON MOTION TO DISMISS CHAPTER 11 CASE, OR, ALTERNATIVELY, FOR ORDER ABSTAINING FROM HEARING CASE*

ROBERT E. GERBER, Bankruptcy Judge.

In this contested matter in a case under chapter 11 of the Bankruptcy Code, commenced by the Century/ML Cable Venture (the "Cable Venture" or "Debtor"), ML Media Partners, L.P. ("ML Media"), one of the two partners in the Cable Venture, moves for an order:

(1) dismissing the case, asserting that:

(a) it was filed by one of the Cable Venture's two partners contrary to the requirements of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P.," or "Bankruptcy Rules"); after the dissolution of the Cable Venture; and without the requisite venture governance authority, and, for each of those reasons, is not a proper voluntary filing;

(b) even if the Court were to consider the Cable Venture's petition a *de facto* involuntary filing, the Cable Venture does not meet the standards for sustaining an involuntary petition; and

(c) the Cable Venture's chapter 11 case should be dismissed, under Bankruptcy Code section 1112(b), for "cause," and in particular for bad faith filing; or, alternatively,

(2) abstaining, pursuant to Bankruptcy Code section from jurisdiction over the

Cable Venture's chapter 11 filing in the best interests of the creditors and the debtor.

For the reasons that follow, the motion is denied. Although the Court has considerable doubt as to whether the Cable Venture's chapter 11 case is sustainable as a voluntary filing, the Court does not have to decide that issue, as the Court believes that the Cable Venture's chapter 11 case is in any event sustainable as an involuntary one, and that it was neither filed in bad faith nor should be dismissed for unenumerated cause. The Court further concludes that it would be inappropriate to abstain. The following represents the Court's findings of fact, conclusions of law, and bases for the exercise of its discretion in connection with ML Media's motion.

*Facts*

*1. The Cable Venture*

The Debtor is a joint venture formed in 1986 for the purpose of, among other things, owning and operating two cable television systems (the "Systems") in Puerto Rico. Century Communications Corporation ("Century"), a debtor in a separate chapter 11 case in this Court, and ML Media each own a 50% interest in the Debtor, which, in turn, owns one of the Systems and 100% of the outstanding stock of non-debtor, Century/ML Cable Corp. ("the Subsidiary"), which owns the other of the Systems.

Century, which filed its chapter 11 case on June 10, 2002, was acquired by its indirect parent, Adelphia Communications Corporation ("Adelphia"), in 1999; Adelphia likewise is a debtor in a chapter 11 case in this Court, having filed its petition under the Code, along with large number of direct and indirect subsidiaries, about two weeks after Century, on June 25, 2002. Century's chapter 11 case is jointly administered with the chapter 11 cases of Adelphia and its subsidiaries. The Debtor's case is *not* jointly administered with the Adelphia chapter 11 cases.

As a joint venture, the Cable Venture has the characteristics in law, at least in most respects, of a partnership.

*2. Joint Venture Agreement*

The Cable Venture was organized under an agreement dated January 1, 1994 (the "Joint Venture Agreement"). Under the Joint Venture Agreement, although Century had day-to-day responsibility for the management of the Systems, that day-to-day management was subject to oversight and supervision of a Management Board, with four seats, of which each of ML Media and Century had two. Section 7.4 of the Joint Venture Agreement provided that ML Media would maintain "significant control" over the Joint Venture, and that Century, as manager, was required to consult with, and obtain the approval of, the ML Media Management Board representatives on "all significant matters relating to the Systems." [1]

Section 12 of the Joint Venture Agreement provided for a means for ML Media to be "cashed out" of the Cable Venture. It provided, in relevant part:

(a) Notwithstanding anything in this agreement to the contrary, at any time or times ML Media may request, by notice to Century, that (i) Century purchase ML Media's interest in the Joint Venture, (ii) the Joint Venture and the Subsidiary sell all of the assets and business of the Cable Division, or (iii) the

---

**1.** Because matters with respect to the governance of the Cable Venture are of particular relevance to this motion, these and are other matters are discussed in a separate section, below.

Joint Venture sell all of the assets and business of [a division unrelated to this controversy].

(b) If ML Media makes a request under section 12(a)(i) or under both sections 12(a)(ii) and 12(a)(iii), the following shall apply:

(i) Century shall elect ... to either (x) cause the Joint Venture and the subsidiary to sell all of the assets and business of the Cable Division and the [unrelated division] for prices and at times consistent with prudent business practice (and approved by ML Media), or (y) purchase, or cause the Joint Venture to purchase (ML Media concurring in such purchase), all of ML Media's interest in the Joint Venture for a purchase price equal to the fair market value of the interest, payable in cash at the closing of the purchase.

Thus, upon an ML Media request, Century had to do one or another of two things: either (1) purchase ML Media's interest in the Cable Venture at its fair market value, as determined by an appraisal, or (2) together with ML Media, sell the Systems to the highest third party bidder.

### 3. Disputes between ML Media and Century Under the Joint Venture Agreement

After ML Media's request, Century elected to sell the Systems, but then, in ML Media's view, wrongfully interfered with ML Media's sale rights, including, allegedly, claiming the right to participate in the sale process as a buyer (as to which Century presumably would have an interest in paying the lowest possible price), at the same time that Century was on the seller side (as to which Century presumably would have an interest, and/or duty, to secure the highest possible price), thus placing itself, at least in ML Media's view, in an "irredeemable conflict of interest." [2]

Additionally, disputes arose between ML Media, on the one hand, and Adelphia and Century, on the other, with respect to the management of the Cable Venture, especially with respect to ML Media's belief (thereafter at least partially substantiated, in state court litigation) that Adelphia and/or Century had disregarded ML Media's rights under the Joint Venture Agreement, excluded ML Media from management of the Cable Venture, and failed to provide ML Media with information with respect to the Systems' operations.

### 4. The Initial Action

The disputes described above led to the filing by ML Media of a state court lawsuit (the "Initial Action")—removed, after Century's chapter 11 filing, to this Court.[3] The Initial Action, which was commenced in March 2000, was brought in the Supreme Court of the State of New York, New York County, by ML Media against Century, Adelphia, and Arahova Communications, Inc. ("Arahova"), another Adelphia subsidiary and another of the debtors in the Adelphia chapter 11 cases. ML Media sought, among other things, remedies for Adelphia's alleged violations of ML Media's management rights, and a declaration that Adelphia, Century and their affiliates could not bid on the assets and business of the Cable Venture. The Initial Action was litigated before New York Supreme Court Justice Ira Gammerman.

---

**2.** Affidavit of Elizabeth McNey Yates, dated June 12, 2002 ("Yates Aff."), ¶ 21.

**3.** Adv. Proc. No. 02–2543 (previously Supreme Court, New York Co., Index No. 601298/00).

On July 12, 2000, Justice Gammerman granted ML Media's motion for partial summary judgment, and enjoined Adelphia from interfering with a sale of the Cable Venture through an arms' length transaction with a third party unaffiliated with Adelphia. Thereafter, on July 25, 2000, ML Media also moved for an order requiring Adelphia to honor ML Media's management rights under the Joint Venture Agreement. That motion led to the entry of a consent order, signed by Justice Gammerman on August 1, 2000 (the "Consent Order"), providing ML Media with at least much of the relief ML Media had sought in its management rights motion. The Consent Order imposed a fair number of specifically articulated requirements that would be imposed upon Century and Adelphia with respect to the management of the Cable Venture.

After further disputes between ML Media, on the one hand, and Adelphia and Century, on the other, ML Media moved, on October 26, 2000, for an order holding Adelphia in contempt for violations of the Consent Order. The contempt motion was litigated before a state court Special Referee, who made a number of findings adverse to Century and Adelphia, all generally to the effect that they had taken management measures without approval of, consultations with, or providing information to, ML Media. On April 30, 2001, Justice Gammerman confirmed the Special Referee's report, and adjudicated Adelphia in contempt.[4]

### 5. The Recap Agreement

In December 2001, after those determinations adverse to Adelphia and Century had been made by the Special Referee and Justice Gammerman, the Initial Action was settled, with the execution of a Stipulation of Settlement ("Settlement Agreement") and a Leveraged Recapitalization Agreement (the "Recap Agreement"), both dated December 13, 2001.[5]

The parties to the Recap Agreement were ML Media, the Joint Venture, Century, Adelphia, and Highland.[6] Under the Recap Agreement, the Cable Venture obligated itself to redeem ML Media's share of the Cable Venture (the "ML Media Share") on September 30, 2002, subject to acceleration (the "Closing Date"), as variously discussed in the Court's four earlier decisions relating to this matter,[7] for a price, subject to upward adjustment, of $275 million.[8] Highland obligated itself to

---

4. Yates Aff. ¶ 27.

5. Yates Aff. Exh. C (Settlement Agreement), Exh. A (Recap Agreement, cited as "Recap Agmt.").

6. Recap Agmt. at 1.

7. *See ML Media Partners, LP, v. Century/ML Cable Venture, (In re Adelphia Communications Corp.)*, 285 B.R. 127 (Bankr.S.D.N.Y. 2002) (denying motion, *inter alia*, to remand claims against Cable Venture and Highland to state court) *("ML Media I"); ML Media Partners, LP v. Century/ML Cable Venture, (In re Adelphia Communications Corp.)*, 287 B.R. 605 (Bankr.S.D.N.Y.2003) (denying both side's motions for summary judgment with respect to acceleration of duty to buy out ML

Media) *("ML Media II"); ML Media Partners, LP, v. Century/ML Cable Venture, (In re Adelphia Communications Corp.)*, unreported, Adv. No. 02–2544, ECF Docket # 87 (Bankr. S.D.N.Y. Feb. 28, 2003) (*inter alia*, denying Highland Motion to dismiss) *("ML Media III"); In re Adelphia Communications Corp.*, 291 B.R. 283 (Bankr.S.D.N.Y.2003) (requiring assumption or rejection of Recap Agreement within 90 days) *("Adelphia–Recap Agreement Assumption/Rejection Decision")*.

8. Recap Agmt. at § 2.1. ML Media contends that the price, as adjusted, is now $279.8 million. The Court assumes for the sake of discussion that this is correct, but as the amount of the adjustment is not material to this dispute, makes no finding now as to the amount.

arrange for the Cable Venture to obtain up to $300 million of debt financing in order to finance the redemption of the ML Media Share,[9] with, Highland, Adelphia and Century jointly and severally liable to provide the Joint Venture with sufficient funds to pay interest on any indebtedness incurred in connection with the redemption financing.[10]

The Recap Agreement further provided that Adelphia was required to purchase the ML Media Share on the next business day after the Closing Date if the Cable Venture failed to close on its obligation to buy out the ML Media Share for any reason.[11] (That date would be October 1, 2002, if there were no acceleration, or the day after any accelerated date for the Cable Venture, if there were.) The Recap Agreement further provided, as relevant here, that time was of the essence with respect to the obligations of the Cable Venture, Adelphia, Century and Highland;[12] that following the Closing Date (at the latest, September 30 or October 1, 2002), Adelphia and Century would no longer have any of the additional management-related rights granted under the Recap Agreement;[13] and should the Cable Venture fail in its obligation to close on or before the Closing Date and Adelphia fail to close the next business day, ML Media would immediately become the full manager of the Systems.[14]

By entering into the Recap Agreement and Settlement Agreement, ML Media suspended certain of the rights that it otherwise would have had under the Joint Venture Agreement. ML Media suspended the litigation of the Initial Action, and agreed to reduce its management rights pending the Closing Date under the Recap Agreement; it agreed that Century and Adelphia would have the day-to-day management of the Cable Venture, and that ML Media would have a dramatically reduced management and supervisory role.

### 6. Recap Agreement Action

ML Media contended that the dates for the Cable Venture, Adelphia, Century, and Highland to perform their respective obligations under the Recap Agreement were accelerated to dates earlier than the September 30 and October 1 dates noted above, and (by reason of an asserted "change of control" resulting from the resignation, as officers and directors, of members of the Rigas Family, and/or defaults on other indebtedness), believed that it thus had the right to require the buyout of its interest, at the $275 million price or as the price might otherwise be adjusted, from and after May 2002. ML Media brought a second action to enforce asserted rights in that regard. That second action (the "Recap Agreement Action"), premised on rights under the Recap Agreement, as contrasted to the Joint Venture Agreement, was filed in state court on June 12, 2002, two days after the June 10 filing by Century of a chapter 11 petition with this Court, and was initially brought by ML Media against the Joint Venture, Adelphia and Highland.

On June 13, both state court actions were removed by defendant Century to this Court.[15] After a hearing before this

---

9. Recap Agmt. at § 8.8(a).

10. Recap Agmt. at § 8.8(b).

11. Recap Agmt. at § 1.2.

12. Recap Agmt. at § 3.2.

13. Recap Agmt. at §§ 8.3, 8.7.

14. Recap Agmt. at § 1.4.

15. Upon amendment of the complaint after removal to this Court, Century was named as a defendant in the Recap Agreement Action as well.

Court, a request by ML Media to take over as manager of the Systems was denied.

Thereafter, the Court denied ML Media's motion to remand the claims in the Recap Action that had been asserted against the Cable Venture and Highland, or alternatively to abstain with respect to them,[16] and denied both sides' motions for summary judgment with respect to their positions as to acceleration.[17] However the Court ruled, in the Acceleration Decision, that the Closing Date took place no later than September 30, 2002 (with respect to the Cable Venture), and October 1, 2002 (with respect to the other parties), and that as a result, they were in default of their obligations under the Recap Agreement (subject, of course, to limitations under the Bankruptcy Code with respect to remedies therefor, and subject to any rights under the Bankruptcy Code to cure defaults) by reason of the failures to make payment to ML Media on the Closing Date.[18] The Court said in that regard:

> [S]ummary judgment is granted to the extent of determining that assuming that the Recap Agreement is enforceable, payment by the Cable Venture was due on September 30, 2002 (and payment by Adelphia, Century and Highland was due on October 1, 2002, one day later), and that, having failed to make payment, each of the Cable Venture, Adelphia, Century and Highland is now in default.

*M.L. Media II,* 287 B.R. at 620.

After the denial of its motion seeking the removal of Century and Adelphia from the management of the Systems, ML Media made a number of requests, sought by conference in connection with the Recap Action, for the Court to intervene to require Century and Adelphia to provide ML Media with information with respect to the management of the Systems. The Court ruled, informally, that such information had to be provided.

Early in the now-removed Initial Action and Recap Agreement Action adversary proceedings in this Court, the Cable Venture—now under the day-to-day control of Adelphia and Century—appeared by a separate counsel, Daniel J. Aaron, Esq. In September 2002, at the time of argument of ML Media's motion seeking an order requiring Adelphia and Century to assume or reject the Recap Agreement "forthwith" (and also seeking, pending such assumption, an order putting ML Media in charge of the Systems), Mr. Aaron advised that he likely would assert, on behalf of the Cable Venture, that the Recap Agreement was unenforceable against the Cable Venture because, insofar as the Cable Venture was concerned, it would result in a fraudulent conveyance. It was contended, *inter alia,* that from the perspective of the Cable Venture, it would be giving up $275 million or more under the Recap Agreement, and getting nothing in return. By answer filed January 27, 2003, the Cable Venture raised the fraudulent conveyance defense in the Recap Agreement Action, asserting that the Recap Agreement was unenforceable for that reason.

### 7. Chapter 11 Filing By Cable Venture

On September 30, 2002—the date its payment of $275 million, subject to upward adjustment, would be due to ML Media—the Cable Venture filed its own chapter 11 case. Very shortly thereafter, ML Media filed the instant motion.

---

16. *ML Media I,* 285 B.R. at 129.

17. *ML Media II,* 287 B.R. at 608.

18. *ML Media II, Id.*

*8. Relevant Cable Venture Governance Provisions*

Each of the Joint Venture Agreement and the Recap Agreement contains provisions that are at least arguably relevant to the authority of the Cable Venture to file this chapter 11 case, and the authority of Century and/or Adelphia to use their control over the management of the Cable Venture to cause it to do so.

The Joint Venture Agreement provided, as noted above, for the business affairs of the Cable Venture to be under the general supervision of the Management Board, with two designees of each of Century and ML Media. Section 7.1 of the Joint Venture Agreement provided, in relevant part:

> The business and affairs of the Joint Venture [i.e., the Cable Venture] shall be under the general supervision of a management board consisting initially of Dr. Leonard Tow ("Tow") and one other designee of Century and two members designated from time to time by ML Media. Upon the death, insolvency, adjudication of incompetence or disability of Tow (but only during the period of Tow's disability or incompetence), the management board shall consist of two members designated from time to time by each of Century and ML Media. The management board shall hold regular meetings not less frequently than quarterly, shall act by unanimous vote of its members (except as otherwise provided in this agreement), and shall adopt such rules of procedure as it may from time to time determine.

Joint Venture Agreement Section 7.1.[19]

The Joint Venture Agreement went on to provide, in its section 7.3, in relevant part:

Century shall be engaged by the Joint Venture and the Subsidiary as the manager of the Systems in perpetuity, subject to termination as provided herein or upon the sale of the System, and, subject to the general supervision of the management board of the Joint Venture and the board of directors of the Subsidiary and to the provisions of this section 7.3 and the provisions of section 7.4, Century shall be responsible for the day-to-day operations of the Systems and for the supervision of the Subsidiary's business.... Century shall perform its responsibilities as manager of the Systems diligently, to the best of its ability and in the best interests of the Joint Venture and the Subsidiary....

*Id.* Section 7.3. Century was to be entitled to a fee for its services; Section 7.3 further provided that if Century was removed as manager of the Systems, ML Media would "become the manager of the Systems, with the duties and responsibilities previously held by Century," and would be "entitled to a management fee in the same amount (or equal to its out-of-pocket expenses, if greater) as the management fee payable to Century." *Id.*

Century's "responsibilities" (some of which might also be regarded as powers) in connection with its role as manager of the Systems would "include, without limitation" responsibilities/powers in 14 enumerated categories. None expressly mentioned filing a petition under any chapter of the Bankruptcy Code, though Category # 13 included "[p]erforming all other management services which Century may deem necessary or desirable for the efficient operation of the Systems."

However, the scope of Century's authority was limited by Section 7.4 of the Joint

---

**19.** A related provision, Section 7.2, provided that subject to the provisions of Section 7.3, the board of directors of the Subsidiary, which operated one of the Systems, would consist of the four members of the management board of the Cable Venture.

Venture Agreement, which dealt with decisions of the Management Board on certain matters that could be regarded as of a non-day-to-day nature, and/or of greater importance. Section 7.4 provided, in relevant part:

> The limited partnership agreement of ML Media requires that ML Media maintain "significant control" over any media property in which it has less than 100 percent interest, which would include the Systems. Accordingly, although Century, as the manager of the Systems, shall have responsibility for the day-to-day operations of the Systems, *it is intended that the manager will consult with, and obtain the approval of, the designees of ML Media on the management board of the Joint Venture and the board of directors of the Subsidiary on all significant matters relating to the Systems.*

*Id.* Section 7.4 (emphasis added). Section 7.4 went on to provide (without limiting the overall authority of the board of directors of the Subsidiary) that:

> [T]he following actions may be taken after the date of this agreement *only with the unanimous consent of· the members of the management board of the Joint Venture* and the board of directors of the Subsidiary . . .

*Id.* (emphasis added)

Section 7.4 went on to list matters in eight identified categories, which, though none expressly mentioned the filing of a petition under the Bankruptcy Code, did include "any other material transaction not in the ordinary course of business," *id.* Section 7.4(g), and "any other proposed transaction that, in the good faith judgment of the manager, would be material to the assets, business or prospects of the Systems." *Id.* Section 7.4(h).

The Court finds as a fact, or as a mixed question of fact and law, that the filing of petition under the Bankruptcy Code would be a "material transaction not in the ordinary course of business," and would also be "material to the assets, business or prospects of the Systems."

However, as noted above, certain of the original provisions of the Joint Venture Agreement, insofar as they addressed the management and governance of the Cable Venture, were modified under the Recap Agreement. The Recap Agreement's Section 8.3 expressly provided that:

> The foregoing provisions of this section 8.3 shall amend the provisions of section 7.3 and 7.4 of the Joint Venture Agreement.

Recap Agreement Section 8.3.

Section 8.3 of the Recap Agreement began:

> (a) Subject to the provisions of section 1.4,[20] during the period from the date of this agreement through the Closing Date, Century shall have the right, power·er and authority to manage and control *all of the* business, affairs, assets, and properties of Buyer [the Cable Venture] and the Subsidiary, and is authorized and empowered to carry out and implement any and all of the purposes of Buyer, subject to the limitations set forth below in this section 8.3.

Recap Agreement Section 8.3(a) (emphasis added). It went on:

> Subject to any limitations specifically set forth in this agreement, Century is authorized and directed on behalf of Buyer and the Subsidiary to take such necessary and appropriate actions to (i) carry out the management activities, *including, but not limited to,* the actions de-

---

**20.** Section 1.4 is of considerable importance; it is discussed below.

scribed in section 7.3(a)(1)-(14) of the Joint Venture Agreement. . . .

*Id.* (emphasis added). That paragraph continued thereafter to give Century other enumerated powers, though only one of them is asserted to be relevant here; that one gave Century the power to "(v) enter into, make and perform such contracts, agreements and other undertakings as may be deemed necessary or advisable for the conduct of the business of Buyer and the Subsidiary." *Id.*

As the Joint Venture Agreement had done in its Section 7.4, the Recap Agreement went on to set forth things that Century, even with its increased management rights, *could not* do without ML Media's consent. Section 8.3(c) of the Recap Agreement provided that notwithstanding the above provisions, Century was not empowered to take any of certain enumerated actions without the unanimous consent of the members of the Management Board. They included (i) dissolving the Cable Venture; (ii) authorizing or issuing any equity securities (or debt securities with equity features) of the Cable Venture; (iii) merging the Cable Venture into any entity other than its own Subsidiary; (iv) selling or otherwise disposing of any Cable Venture Assets except in the ordinary course of business; (v) purchasing or acquiring any assets other than in the ordinary course of business, except for assets to be used in upgrades of the Systems; and (vi) incurring any indebtedness other than certain identified indebtedness.

The Court notes, in this connection, that the Section 8.3 list of matters requiring ML Media approval did not include the filing of a petition under the Bankruptcy Code, though it did include matters (such as issuing equity securities, and incurring debt) that are commonly aspects of a chapter 11 plan. The management powers granted to Century under the Recap

Agreement were plainly broader than they had been under the Joint Venture Agreement; the Court notes, as it did at the outset of this discussion, that the Recap Agreement expressly modified not just Joint Venture Agreement Section 7.3, but also Joint Venture Agreement Section 7.4—the latter of which had set forth a larger list of matters (including any that was a "material transaction not in the ordinary course of business," Section 7.4(g), or would be "material" to the Systems, Section 7.4(h)) that would require ML Media's approval.

The Court further notes that the entirety of Recap Agreement Section 8.3(a) was "[s]ubject to" the provisions of Section 1.4 of the Recap Agreement. Subject to an exception neither side contends to be applicable here, Section 1.4 provided, in relevant part:

> If Buyer [the Cable Venture] fails to redeem Seller's [ML Media's] Interest on or before September 30, 2002 and Adelphia fails for any reason . . . to purchase Seller's Interest on October 1, 2002 . . ., on October 2, 2002, Seller shall become the manager of the Systems without any further action by Adelphia, Century or Seller. . . .

Recap Agreement Section 1.4. It further provided that if an acceleration event had taken place (a matter which ML Media contends took place, but as to which this Court determined there was an issue of fact, *see ML Media II*), ML Media would become the manager at an earlier time. It continued thereafter:

> Accordingly, Adelphia hereby resigns as manager of the Systems effective as of the date that Seller becomes entitled to be the manager of the Systems in accordance with this section 1.4; Adelphia may not under any circumstances or for any reason seek to revoke its resignation or otherwise take any action to hin-

der or delay the transfer of management responsibility to Seller in accordance with this provision.

*Id.*

This Court ruled, in *ML Media II,* that issues of fact existed with respect to whether or not there was an acceleration event, but further ruled that in any event (assuming the Recap Agreement is enforceable), the duty of the Cable Venture to make payment matured on October 1. Putting aside, for the time being, the issue of the availability of specific performance in bankruptcy, that would trigger a management changeover on October 2; of course, the Cable Venture filed on September 30.

### 9. *Provisions Relevant to Dissolution*

The Joint Venture Agreement also had provisions relevant to grounds for dissolution of the Cable Venture. It provided, in its section 10.1:

The Joint Venture shall be dissolved prior to the expiration of its term only upon the occurrence of one of the following events: (a) the Venturers' election to dissolve the Joint Venture; or (b) termination of the operations of the Joint Venture and the Subsidiary or the sale or other disposition by the Joint Venture and the Subsidiary of all of their assets.

Neither of those contingencies has yet occurred.

### 10. *C–TC Findings*

The Court also makes the following factual findings, with respect to matters relevant to determinations on matters to dismiss a chapter 11 case for cause and/or "bad faith filing," under the Second Circuit's decision in *In re C–TC 9th Ave. Partnership,* 113 F.3d 1304 (2nd Cir.1997), discussed below:

(1) The Debtor has diverse assets, the two Systems, which are operating businesses, as compared and contrasted to, a single asset, such as is in single-asset real estate bankruptcies;

(2) ML Media's claim is unsecured, rather than secured, but the Debtor has at most very modest unsecured debt other than the debt owed to ML Media;

(3) The Debtor's assets are not the subject of a foreclosure action as a result of arrearages or default on debt, but are the subject of claims in pending litigation (now in this Court) between, *inter alia,* ML Media and the Debtor;

(4) The Debtor's financial condition is in large measure, if not totally, a two-party dispute between the Debtor, on the one hand, and ML Media on the other, with respect to the enforceability of the Recap Agreement, and, as related to that, the Debtor's contention that the duty of the Debtor (as contrasted to Century and/or Highland) to make payment to ML Media is voidable or void as a fraudulent conveyance;

(5) The timing of the Debtor's filing does *not* evidence an intent to delay or frustrate the legitimate efforts of ML Media to enforce its rights, as this litigation was ongoing, and would continue, irrespective of the Debtor's filing, or the timing thereof.

(6) The Debtor has substantial cash flow, though it does not have significant enough cash flow to pay a judgment in excess of $275 million without the sale of a major portion of its assets;

(7) The Debtor *can* meet current expenses;

(8) The Debtor has a considerable number of employees.

### *Discussion*

As noted above, ML Media seeks to dismiss the Cable Venture's chapter case

on three separate grounds—contending that:

 (A) Century could not properly cause a voluntary filing, because

 (i) Century and the Cable Venture failed to satisfy the requirements of Fed. R. Bankr.P. 1004(a);

 (ii) the Cable Venture had already been dissolved, as a matter of law, by reason of Century's earlier bankruptcy filing; and

 (iii) Century lacked the authority, under the Joint Venture Agreement to do so;

 (B) it could not be upheld even as an involuntary case, because

 (i) the Court should not reward Century for its wrongful voluntary filing by alternatively considering the propriety of the filing as an involuntary case; and

 (ii) in any event, the requirements for an involuntary petition have not been satisfied; and

 (C) the chapter 11 case should be dismissed, under Bankruptcy Code section 1112(b), for cause, including bad faith filing.

Alternatively, ML Media contends that even if the Cable Venture's chapter 11 case is not subject to dismissal, the Court should abstain from hearing it, and thus dismiss, in its discretion, under Bankruptcy Code section 305. The Court considers these contentions in turn.

## I.

### Dismissal

### A.

### Propriety of Voluntary Filing

Initially, ML Media contends that Century could not properly cause the Cable Venture to make a voluntary filing under the Code. Though ML Media's contentions in this regard are hardly frivolous, the Court ultimately disagrees.

### (i) Requirements of Fed. R. Bankr.P. 1004(a)

■ ML Media—noting that it was a 50% owner and general partner of the Cable Venture (and the holder of one-half of the four seats on the Cable Venture's Management Board), and that it did not consent to the Cable Venture's filing under the Bankruptcy Code—argues, as the first of several points, that the Cable Venture failed to comply with the requirements of Fed. R. Bankr.P. 1004(a). That rule, as it existed at the time the Cable Venture's chapter 11 case was filed (before an amendment that would eliminate the issue in December 2002), provided:

(a) Voluntary Petition. A voluntary petition may be filed on behalf of the partnership by one or more general partners if all general partners consent to the petition.

(b) Involuntary Petition: Notice and Summons. After filing of an involuntary petition under § 303(b)(3) of the Code, (1) the petitioning partners or other petitioners shall cause forthwith a copy of the petition to be sent to or served on each general partner who is not a petitioner; and (2) the clerk shall issue forthwith a summons for service on each general partner who is not a petitioner. Rule 1010 applies to the form and service of the summons.

2002 Collier Pamphlet Ed. Bankruptcy Rules, Rule 1004. The text of former Rule 1004 at least strongly suggests a requirement, from a bankruptcy perspective (as contrasted to one of the substantive law regulating partnership governance), requiring all general partners to consent to the filing of the petition.

However, both before and after the amendment of Fed. R. Bankr.P. 1004, there has been no counterpart provision of the Code setting out the requisite authority or joinder of partners to commence a voluntary case under the Code, and the Bankruptcy Rules have long been thought of as regulating procedure, rather than substantive rights. For that reason, and by reason of holdings that applicable non-bankruptcy law determines whether or not there is the requisite authority to file on behalf of a partnership, Fed. R. Bankr.P. 1004 was amended to delete the language in the Bankruptcy Rules that formerly was embodied in Fed. R. Bankr.P. 1004(a). The Advisory Committee Note with respect to the 2002 Amendment provided, in relevant part (after noting the absence of a provision in the Code addressing the matter):

> The Supreme Court has held in the corporate context that applicable non-bankruptcy law determines whether authority exists for a particular debtor to commence a bankruptcy case. *See Price v. Gurney*, 324 U.S. 100[, 65 S.Ct. 513, 89 L.Ed. 776] (1945). The lower courts have followed this rule in the partnership context as well. *See, e.g., Jolly v. Pittore*, 170 B.R. 793 (S.D.N.Y. 1994); *Union Planters National Bank v. Hunters Horn Associates*, 158 B.R. 729 (Bankr.M.D.Tenn.1993); *In re Channel 64 Joint Venture*, 61 B.R. 255 (Bankr.S.D.Ohio 1986). Rule 1004(a) could be construed as requiring the consent of all of the general partners to the filing of a voluntary petition, even if fewer than all of the general partners would have the authority under applicable nonbankruptcy law to commence a bankruptcy case for the partnership. Since this is a matter of substantive law beyond the scope of these rules, Rule 1004(a) is deleted as is the designation of subdivision (b).

2003 Collier Pamphlet Ed. Bankruptcy Rules, Rule 1004, Advisory Committee Note—2002 Amendment (emphasis added).

As the pre–2002 Amendments form of Fed. R. Bankr.P. 1004 was applicable at the time the Cable Venture's chapter 11 case was filed, the Court does not, of course, ignore it, or rely on the present form of Fed. R. Bankr.P. 1004 instead. But for the same reasons that the Advisory Committee drafters concluded that it was inappropriate to retain the provisions of Rule 1004(a)—because it could be deemed to impose substantive requirements when in fact the matter of authority to file is one of substantive law beyond the scope of the Bankruptcy Rules—the Court does not believe that it can properly consider Rule 1004(a) to impose substantive requirements beyond those under applicable partnership governance law. The Court believes that it must look instead to the contractual provisions, and statutory law, relevant to the authority to file on behalf of the Cable Venture.

### (ii) Dissolution of the Cable Venture

ML Media next argues that Century could not cause the Cable Venture to file a petition under the Bankruptcy Code because under state law, the Cable Venture already had been dissolved, by reason of the earlier filing of a petition under the Code by one of the Cable Venture's partners, Century. The Court is constrained to disagree.

 Plainly ML Media is correct when it notes that as a general matter under New York law (which governs under the Joint Venture Agreement, *see* Joint Venture Agreement § 15.3), the filing of an individual bankruptcy petition by one partner causes the dissolution of the part-

nership. NY Partnership L. § 62(5).[21] After any such dissolution, the partnership would no longer be bound by any act of a partner after that partner had filed its bankruptcy petition, *id.* § 66(3)(b),[22] and the other partners would then have the right to wind up the partnership affairs. *Id.* § 68.[23] However, the Cable Venture and Century argue that there was no dissolution, because the Joint Venture partners had previously agreed on the sole grounds for dissolution (and that a bankruptcy filing by one Joint Venture partners was not one of them), and that an agreement of that character could and did trump the general rule of N.Y. Partnership L. § 62(5). The Court agrees.

■ The Court does not need to decide, and does not decide, whether, as Century and the Cable Venture contend, application of N.Y. Partnership L. § 62(5) would constitute an unenforceable *ipso facto* clause, be inconsistent with chapter 11 policy favoring reorganization, or otherwise be impermissible under bankruptcy law.[24] That is so because under New York law, "partners may include in the partnership articles practically 'any agreement they wish,'" *Riviera Congress Assocs. v. Yassky,* 18 N.Y.2d 540, 223 N.E.2d 876, 277 N.Y.S.2d 386 (1966) (*quoting Lanier v. Bowdoin,* 282 N.Y. 32, 38, 24 N.E.2d 732, 734 (1939)),[25] and, accordingly, may con-

**21.** The statute provides, in relevant part:
Dissolution is caused:
. . .
5. By the bankruptcy of any partner or the partnership;

**22.** That section provides, in relevant part:
1. After dissolution a partner can bind the partnership except as provided in subdivision three. . . .
. . .
3. The partnership is in no case bound by any act of a partner after dissolution
(a) Where the partnership is dissolved because it is unlawful to carry on the business, unless the act is appropriate for winding up partnership affairs; or
(b) Where the partner has become bankrupt. . . .

**23.** That section provides:
Unless otherwise agreed the partners who have not wrongfully dissolved the partnership or the legal representative of the last surviving partner, not bankrupt, has the right to wind up the partnership affairs; provided, however, that any partner, his legal representative, or his assignee, upon cause shown, may obtain winding up by the court.

**24.** As both sides recognize, there is a split on the cases on that issue, with the one case in this district holding that the bankruptcy filing of a general partner *can* result in the dissolution of the partnership. *Compare In re Siegal,* 190 B.R. 639, 646 (Bankr.D.Ariz.1996) (Case,

J.) (partnership does not dissolve upon chapter 11 filing by partners and partnership); *In re Nizny,* 175 B.R. 934, 939 (Bankr.S.D.Ohio 1994) (Clark, C.J.) (same); *In re Hawkins* 113 B.R. 315, 316 (Bankr.N.D.Tex.1990) (Akard, J.) (same); *and In re Safren,* 65 B.R. 566, 569–570 (Bankr.C.D.Cal.1986) (Bufford, J.) (same) *with In re Sunset Developers,* 69 B.R. 710, 712–713 (Bankr.D.Idaho 1987) (Hagan, J.) (bankruptcy filing of one partner automatically dissolves partnership); *In re Minton Group, Inc.* 27 B.R. 385 (Bankr.S.D.N.Y.1983) (Schwartzberg, J.), *aff'd without discussion of this issue,* 46 B.R. 222 (S.D.N.Y.1985) (Haight, J.). The Court also believes that the answer could turn on surrounding facts, such as whether the bankruptcy case is a liquidation under chapter 7 (for which state court dissolution procedures would be perfectly adequate) or a reorganization under chapter 11 (for which the value maximization devices under chapter 11 might lead to benefits for creditors); whether a chapter 7 trustee would be stepping into the shoes of a general partner exercising day-to-day management responsibilities, as to which other general partners might have justifiable concerns; or the extent to which the general partner's bankruptcy would have other effects on the conduct of the partnership's business. The Court does not decide the matter now.

**25.** *See also In re Imperial 400 National, Inc.,* 429 F.2d 671, 678 n. 9 (3rd Cir.1970) ("[T]he partnership agreement is the basic document setting forth the rights and duties of the part-

tract, in their partnership or joint venture agreement, with respect to the right to dissolution, even if the effect of such would be to trump the entitlement to dissolution that otherwise would exist by statute. *See Prudential Insurance Co. of America v. Hilton Hotels Corp.*, 1996 WL 340002 at \*4 (S.D.N.Y.1996) (Wood, J.) (*"Prudential"*) (noting that parties had the ability to contract away the right to a judicial dissolution, but holding that, under their agreement, they had not done so).

■ Thus, as "[p]arties to a partnership agreement have the right to contract around nearly any provision of partnership law," *Prudential,* 1996 WL 340002 at \*4, they may, if they wish, provide that such grounds are exclusive. However, they must do so "specifically and unequivocally." *Id. See also Cooper v. Isaacs,* 448 F.2d 1202, 1206 (D.C.Cir.1971) (with respect to a District of Columbia statute that authorized dissolution by court decree, "[a] partnership agreement can presumably change the result, but the terms of the agreement must be quite specific to effect such a change").

Judge Wood's decision in *Prudential,* which involved a dispute between joint venturers with substantial similarities to this one (including claims by the "investor" joint venturer, which, as here, had a 50% in the joint venture, that the "manager" joint venturer was abusing its management rights and breaching its fiduciary duties to its joint venture partner), did not involve the bankruptcy of one joint venturer, but did involve the exact issue on this prong of ML Media's motion—whether the joint venturers could "contract around" their statutory rights to dissolution under New York law, *id.,* and, if so, whether they

had done so. As is apparent from the foregoing, Judge Wood recognized that they had the *ability* to contract around the statutory rights. However she concluded, based on the language of their joint venture agreement, that they had not done so.

■ Applying that same methodology, this Court must determine whether or not ML Media and Century, in entering into the Joint Venture Agreement, provided that the grounds for dissolution that they had enumerated were to be exclusive. The Court concludes that they *were* exclusive, and that the Joint Venture Agreement "specifically and unequivocally" so provided, as *Prudential* requires. As the Court noted above in its discussion of the facts, the Joint Venture Agreement provided:

> The Joint Venture shall be dissolved prior to the expiration of its term *only* upon the occurrence of one of the following events: (a) the Venturers' election to dissolve the Joint Venture; or (b) termination of the operations of the Joint Venture and the Subsidiary or the sale or other disposition by the Joint Venture and the Subsidiary of all of their assets.

Joint Venture Agreement § 10.1 (emphasis added).

The use of the word "only" with respect to the events that would trigger dissolution is plain and unambiguous. That distinguishes this case from *Prudential,* where Judge Wood had noted:

> Here, ... while the partnership agreements list several events that can terminate the partnership, there is no language indicating that this list is exclusive or that the parties agree to abrogate the explicit right to a court-or-

ners among themselves, and it may alter the provisions of the Partnership Act"); *In re Sturman,* 222 B.R. 694, 711 (Bankr.S.D.N.Y. 1998) (Beatty, J.) (acknowledging parties'

ability to alter New York Partnership Law by partnership agreement, citing *Imperial 400 National*).

dered dissolution conferred by NYPL §§ 62(6) and 63. *Prudential,* 1996 WL 340002 at *4. Indeed she noted further that another provision in the joint venture agreements there had stated that those events did "not preempt the parties' other rights...." *Id.* at *4–*5. Here, where "only" preceded the list of matters that would trigger dissolution, in a context that was clear and unequivocal, and there is elsewhere no comparable reservation of the right to invoke other statutory grounds for resolution, the Court is not in a position to disregard the word "only." The bankruptcy filing by Century did not result in the dissolution of the Cable Venture, as the joint venturers had contracted otherwise.[26]

### (iii) Authority to File

The most difficult issue is whether, even though the Cable Venture was not dissolved, as a matter of New York statutory law, by reason of Century's bankruptcy filing, Century had the authority unilaterally to cause the Cable Venture to file a

voluntary petition under the Code, which so plainly was outside of the ordinary course, without the consent of its 50% joint venture partner ML Media. Century's ability so to act for the Cable Venture (on September 30 and thereafter) was contingent on Century's enhanced rights as manager, and its non-removal as such. These are matters as to which the Court has found disputed material issues of fact and, in addition, bankruptcy law issues as to the Court's ability to provide ML Media with remedies ML Media desires. But the Court has previously noted that even if Century's duty to pay ML Media was not accelerated, Century was in default of its obligation to pay ML Media from and after October 1, 2002, assuming that the Recap Agreement is enforceable—and if the Recap Agreement is not enforceable, the Court has some difficulty seeing how Century would be entitled to the increased management rights it gets thereunder.

For those reasons, which are articulated more fully in the note below,[27] the Court

---

26. For this reason, the concerns expressed by the Second Circuit in *In re C–TC 9th Ave. P'ship,* 113 F.3d 1304, 1309 (2d Cir.1997) ("*C–TC*"), with respect to whether, as a partnership in dissolution, the Cable Venture was eligible to file a chapter 11 case, are inapplicable.

27. The relevant governance provisions, as embodied in the Joint Venture Agreement and Recap Agreement, have been quoted above. The Joint Venture Agreement, as originally drafted before its amendment by the Recap Agreement, plainly gave day-to-day management control to Century, but equally plainly required Century to secure the approval of the Management Board—which as a practical matter would mean securing ML Media's consent—before taking actions out of the ordinary course. Section 7.4 of the Joint Venture Agreement expressed an unambiguous intention that ML Media approval be secured "on all significant matters relating to the Systems," and though these words may be deemed to be precatory in the context in which they were used, any remaining doubt

would be dispelled by the provisions of Sections 7.4(g) and 7.4(h), requiring Management Board approval of "any other material transaction not in the ordinary course of business," and any proposed transaction that "would be material to the assets, business or prospects of the Systems."

The filing of a petition under the Bankruptcy Code would be a "material transaction not in the ordinary course of business," and would also be "material to the assets, business or prospects of the Systems." As a result, under the language of the Joint Venture Agreement as originally drafted (and Sections 7.4(g) and 7.4(h), in particular), Century did not have the power or authority to cause the Cable Venture to file a petition under the Bankruptcy Code.

But as noted above, the Joint Venture Agreement was amended by the Recap Agreement, and the Recap Agreement's Section 8.3 expressly amended Joint Venture Agreement Section 7.4. Under the Recap Agreement, Century's rights to manage the Cable Venture, and act on its behalf,

has considerable doubts as to whether Century could, given its defaults, and/or the asserted unenforceability of the Recap Agreement, utilize its increased management rights to effect a voluntary filing for the Cable Venture, and the Court is certainly not of a mind now to rule that Century properly could do so. However, the Court ultimately does not need to address this issue, as it believes that the issue can and should be determined under the Bankruptcy Code provisions dealing with involuntary filings, which expressly contemplate filings on behalf of partnerships where their general partners have different desires.

## B.

### *Propriety of Involuntary Filing*

ML Media then disputes the propriety of deeming the Cable Venture's filing to be appropriate as a *de facto* involuntary filing. ML Media contends (1) that by reason "of Century's knowingly improper filing" of the Cable Venture's petition, this Court should decline, as a procedural matter, to treat it as a *de facto* involuntary filing, and (2) that even if the previously filed voluntary petition is deemed to be an involuntarily petition, the Court should find, as a substantive matter, that the requirements for the filing of an involuntary case have not been satisfied.

were dramatically increased. The difference was not so much with respect to day-to-day affairs (as Century already had that authority), but with respect to transactions that would be out of the ordinary course. Section 8.3(c) identified matters that would continue to require Management Board authority, and the list was narrowed substantially. Sections 7.4(g) and 7.4(h) were not carried over to the post-Recap Agreement governance regime, either expressly or by substitution of substantially similar provisions.

The Court is not particularly persuaded by the point expressly or impliedly made by each of the Cable Venture and Century that the Court should find the bankruptcy filing to have been authorized because the Section 8.3(c) list of matters requiring Management Board assent failed expressly to include it—though obviously, if a bankruptcy filing had been listed, that would end the discussion very quickly. Rather, the Court regards the deletion, in substance, of Sections 7.4(g) and 7.4(h) to be of considerable importance, when coupled with the inclusion of certain out-of-the-ordinary-course matters that would continue to require Management Board assent. For better or worse, when it executed the Recap Agreement, ML Media granted Century the authority to manage the Joint Venture to a considerably greater degree than Century could have done under the original Joint Venture Agreement, and so long as Century could act under the Recap Agreement, Cen-

tury could cause (subject to Section 1.4 limitations) the Cable Venture to file.

The more difficult question is the effect of Recap Agreement Section 1.4 on this analysis, as Section 8.3 was expressly "subject to" the former section. Section 1.4, it will be recalled, provided for an automatic change in the manager of the Systems upon a failure to redeem ML Media's interest—with that change to take place on October 2, 2002, if there were no acceleration, or an earlier date, if there were. In *ML Media II*, the Court found there to be material issues of disputed fact with respect to acceleration to an earlier date, but found that in any event, the Cable Venture's duty to pay (once more, assuming the Recap Agreement is enforceable) matured on September 30, 2002, and Century's duty to pay matured on the next day, October 1. Upon a default by the Cable Venture and Century, ML Media would plainly have management changeover rights from October 2 and thereafter (subject to the ability to enforce them by specific performance in a bankruptcy case). This, coupled with Century's contention that obligations imposed on it under the Recap Agreement are unenforceable as a fraudulent conveyance (and the Court's concern that if that is so, Century management rights under the Recap Agreement likewise fall), causes the Court to have considerable uncertainty as to Century's authority to cause the Cable Venture to file a voluntary petition.

*(i) Ability to Regard Petition as De facto Involuntary Filing*

As ML Media recognized in its opening brief,[28] courts have not infrequently opted to treat partnership voluntary petitions filed with insufficient partner consent as *de facto* involuntary petitions, going back to the very earliest days under the Code. *See In re R.S. Pinellas Motel Partnership*, 5 B.R. 269 (Bankr.M.D.Fla.1980) (Paskay, J.) (*"R.S. Pinellas Motel"); In re Monterey Equities–Hillside*, 73 B.R. 749 (Bankr. N.D.Cal.1987) (Perris, J.) (*"Monterey Equities"); In re Memphis–Friday's Assocs.*, 88 B.R. 821 (Bankr.W.D.Tenn.1988) (Brown, J.) (*"Memphis–Friday's"); In re SWG Assocs.*, 199 B.R. 557 (Bankr. W.D.Pa.1996) (McCullough, J.) (*"SWG"*).[29] ML Media's contention is not so much that this Court lacks the power to regard (and then evaluate) the Cable Venture's voluntary petition as a *de facto* involuntary one; rather, ML Media contends that under the facts here, by reason of wrongful on Century's part, the Court should not exercise the power it has.[30] As ML Media put it:

> Century filed a voluntary petition with full knowledge that it lacked authority to do so, with full knowledge that its Joint Venture partner was in strong opposition to this action and (as shown below in Section II) with full knowledge that such filing was in violation of Section 303(b)(2). It should not be rewarded for

its wrongdoing by deeming the improper voluntary petition to be converted to an equally improper involuntary one.

(ML Media Opening Br. at 19). In connection with this argument, ML Media cites *In re Stavola/Manson Electric Co.*, 94 B.R. 21 (Bankr.D.Conn.1988) (Shiff, J.) (*"Stavola/Manson"*), which, after considering *Monterey Equities, see id.* at 25, declined to follow it, and thus did not apply it to permit a corporation's chapter 11 filing, where an involuntary case could arguably be sustained based on alternative petitioning creditors with the requisite amount of debt.

However, while the Court has no doubt that Century caused the Cable Venture to file "with full knowledge that its Joint Venture partner was in strong opposition to this action," the Court has more difficulty with ML Media's other factual predicates, and in particular the conclusion that Century caused the bankruptcy case to be filed knowing that its was acting improperly. As is apparent from the discussion above,[31] the matter of Century's authority to take action for the Cable Venture was and is a close one, as to which the Court is not in a position to conclude that Century was guilty of wrongdoing.

 Looking at the issue then, as to whether the Court should decline to consider whether the Cable Venture's filing

---

28. ML Media Opening Br. at 18 & n. 5. Even though none of the potentially contrary authority was binding authority that would be controlling on this Court, ML Media refreshingly addressed it in its *opening* brief, a salutary practice for which the Court is appreciative.

29. *See also* Resnick & Sommer, 2 *Collier on Bankruptcy* ¶ 303.07[2] ("On occasion, the actual filing is commenced as a voluntary case but it is treated as an involuntary petition under section 303(b)(3)(A)"); *In re The Food Gallery at Valleybrook*, 222 B.R. 480 (Bankr. W.D.Pa.1998) (McCullough, J) ("Valleybrook

Food Gallery") (noting that in an earlier decision, the court had ruled that it would treat a previously filed voluntary petition as an involuntary one where the managing general partner, although possessing authority to file a voluntary petition on the debtor's behalf, nevertheless also needed the consent of the debtor's other general partner, which consent was lacking).

30. *See* ML Media Opening Br. at 19.

31. *See* n. 27 *supra*.

can be deemed to be appropriate as a *de facto* filing under the facts presented here, the Court believes it properly can reach the merits of the involuntary filing. The Bankruptcy Code, by its section 303(b)(3),[32] expressly authorizes the filing of involuntary cases by any one or more of the general partners, and without regard to the amount of claims or number of petitioners. *See* Resnick, *Bankruptcy Law Manual* § 3:17 at page 176 (5th Ed.2002). It plainly contemplates that there may be differences of views amongst the general partners, and that it might be appropriate for a partnership to be in a case under the Code even though the consent of all partners is lacking. Here the Code expressly provides for the mechanics of involuntary proceedings to deal with situations where the consent of all partners cannot be obtained, and the Court does not regard the concerns voiced by Judge Shiff in *Stavola/Manson,* expressed in the context of a corporate filing, to be applicable, particularly to a material degree, to a partnership filing like the here.[33]

Though Century's ability to initiate a voluntary filing is debatable, the Court cannot and does not find that, by its action, Century forfeited the usual rights of a general partner to commence an involuntary bankruptcy case under section 303,

especially since this case is in its infancy, and no substantive actions—especially actions prejudicial to ML Media—have been taken. *See SWG,* 199 B.R. at 561 (refusing to dismiss voluntary partnership petition, and instead treating it as a de facto partnership petition, given the "early stage within which it presently resides" and the fact that the court had not yet taken "any substantive action regarding the affairs of the debtor"); *In re Memphis–Friday's,* 88 B.R. at 827 (treating chapter 11 petition improperly filed by partner without other partners' consent as an involuntary petition because the court had "not yet taken any substantive action").

The Court believes that with Century's ability to cause a voluntary filing subject to legitimate debate, it is fully appropriate to deem it to be a *de facto* involuntary filing, and then to test it against the requirements for a filing of that nature.

*(ii) Requirements for an Involuntary Filing*

ML Media then argues that even if the Court is free to consider whether the Cable Venture's case is sustainable as an involuntary filing, the Cable Venture fails to satisfy the requirements for an involuntary case, and in particular the require-

---

**32.** Bankruptcy Code section 303 provides, in relevant part:

b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

. . .

(3) if such person is a partnership—

(A) by fewer than all of the general partners in such partnership. . . .

**33.** The Court notes that Judge Shiff's decision not to follow *Monterey Equities–Hillside* was "in the context of this case." 94 B.R. at 25. Substantially contemporaneously with or after *Stavola/Manson,* two more cases, *Memphis–Friday's* and *SWG Assocs,* were published, each of which holds consistently with

*Monterey Equities–Hillside* in a partnership situation. While this Court would be inclined to follow *Stavola/Manson* if faced with another corporate filing situation of the type *Stavola/Manson* addressed—especially if, as in *Stavola/Manson,* the person causing the voluntary petition to be filed lacked the ability or status to file an involuntary petition—this Court believes that the express provisions of the Code authorizing one partner to file where partnership unanimity is not obtained dictate a different result here, and that reliance on the line of authority reflected in *R.S. Pinellas Motel, Monterey Equities–Hillside, Memphis–Friday's* and *SWG* in partnership situations is appropriate.

ments of Bankruptcy Code section 303(h). That section provides, in relevant part:

> If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—
>
>> (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute. . . .

ML Media contends that treatment of the petition as involuntary would be inappropriate because Century cannot meet the requirement under section 303(h)(1) that, "the debtor is generally not paying debts as they become due," because "[o]nly those debts that are *not* the 'subject of a bona fide dispute' shall be considered in making that determination." [34] ML Media notes, in that connection, that the Cable Venture has generally paid its debts as they came due except for ML Media's $279.8 million; ML Media quotes the Cable Venture's schedule of the 20 largest unsecured claims, which states that "[a]s of the Petition Date, [the Cable Venture] is current with nearly all of its payments to unse-

cured trade creditors except for those amounts that are not due and payable." [35] ML Media continues that the unpaid $279.8 million that ML Media contends is owed by the Cable Venture to ML Media is not properly part of the Court's analysis, because the Cable Venture listed that debt in its petition as "Contingent and Disputed." [36]

■■■■ ML Media does not press a contention that, under the facts here, the single $279.8 million debt is insufficient to meet the "generality" requirement—that the debtor is "generally not paying such debtor's debts as such debts become due." [37] Its contention is rather that because the Cable Venture stated that the ML Media debt was "Disputed," that debt cannot be considered under the language in section 303(h) that addresses the debts to be taken into account in applying the "generality" requirement—which provides that an order for relief shall be entered "only" if the debtor is generally not paying such debtor's debts as such be come due, "unless such debts are the subject of a bona fide dispute." ML Media's argument is hardly without some force—particularly in light of recent caselaw underscoring the importance of construing statutes, whenever possible, in accordance with their literal language. *See United States v. Ron Pair*

---

34. ML Media Opening Br. at 20.

35. ML Media Opening Br. at 21.

36. ML Media Opening Br. at 21. There is no dispute that the Cable Venture did, indeed, list the debt to ML Media in that fashion.

37. That is understandable. The failure to pay a single debt can satisfy the requirement of generality where the debt is sufficiently substantial. *See In re Fischer*, 202 B.R. 341, 350–351 (E.D.N.Y.1996) (Seybert, J.) (rejecting the rationale of some courts that had categorically prohibited involuntary petitions in "single creditor" cases, noting that "[t]here is substantial authority for the proposition

that even though an alleged debtor may owe only one debt, or very few debts, an order for relief may be granted where such debt or debts are sufficiently substantial to establish the generality of the alleged debtor's default"); *Valleybrook Food Gallery*, 222 B.R. at 487–488 (holding that the failure to pay a single creditor could and did support a finding that a debtor was generally not paying its debts as they become due, citing, *inter alia, Fischer*). The ML Media claim, unless the Recap Agreement is unenforceable as effecting a fraudulent conveyance, represents 96% of all claims set forth in the petition. (ML Media Br. at 25).

*Enters.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (*"Ron Pair"*). But ultimately the Court rejects it, because the Court believes that construing section 303(h) in that fashion would lead to an absurd result, contrary to the manifest intention of Congress—one of the few bases for determining not to construe a statute in accordance with its literal terms.

The Court starts with the recognition that while the Cable Venture acknowledges, as it must, that under the Recap Agreement, it now has a debt to ML Media of $279.8 million, the Cable Venture seeks to declare that debt unenforceable by reason of contentions of fraudulent conveyance. Since the Cable Venture's position is that fraudulent conveyance contentions make the Cable Venture's obligation to pay the $279.8 million voidable (or perhaps void), the debt is "in dispute" no less than it would be if the Cable Venture were contending that the debt had no basis in the first place, or that the Cable Venture was excused from payment by reason of its counter-party's material breach. And if, as the Court assumes, counsel for Century and the Cable Venture have engaged in the appropriate analysis before taking that position, the Court likewise believes that the "dispute" is bona fide.

Thus the Court assumes, for the purposes of this analysis, that the debt to ML Media is indeed "the subject of a bona fide dispute," satisfying the literal requirements of section 303(h). The issue then is whether the Court should deny an order for relief based on the literal reading.

Here the Court starts with a strong presumption that section 303(h) should be construed in accordance with its literal terms. *See Ron Pair*, 489 U.S. at 242, 109 S.Ct. 1026 ("[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demon-

strably at odds with the intentions of its drafters' "); *see also, e.g., Fischer*, 202 B.R. at 348 ("[t]he prevailing rule of statutory construction requires the courts to follow the plain language of the statute, unless following such language would produce a result that is clearly at odds with Congress's intent"). But construing section 303(h) literally would in this Court's view indeed produce a result "demonstrably at odds" with the intentions of Congress. It would take a clause that was added to the Code for debtor protection— to protect debtors from the extortion of being subjected to involuntary bankruptcy cases by others trying to collect on debatable obligations from them—and turn it to a debtor's disadvantage.

The "bona fide dispute" requirement was not part of section 303(h) when the Code initially was enacted. At that time, section 303(h)(1) required only that "the debtor is generally not paying such debtor's debts as such became due." *See In re B.D. Int'l Discount Corp.* 701 F.2d 1071, 1073 n. 4 (2d Cir.1983) (quoting language of section 303(h) at the time). In 1984, Congress amended the language of section 303(h)(1) so that it would then require that "the debtor is generally not paying such debtor's debts as such debts become due *unless such debts are the subject of a bona fide dispute.*" 11 U.S.C. § 303(h)(1) (West 2002) (emphasis added).

Bankruptcy courts addressing the 1984 amendment have noted its purpose to protect the rights of debtors. In *In re Lough*, 57 B.R. 993 (Bankr.E.D.Mich.1986), for example, Judge Rhodes quoted relevant legislative history:

The reason for the introduction of this additional language in the statute was explained by its proponent as follows: The problem can be explained simply. Some courts have interpreted section 303's language on a debtor's general fail-

ure to pay debts as allowing the filing of involuntary petitions and the granting of involuntary relief even when the debtor's reason for not paying is a legitimate and good faith dispute over his or her liability. This interpretation allows creditors to use the Bankruptcy Code as a club against debtors who have bona fide questions about their liability, but who would rather pay up than suffer the stigma of involuntary bankruptcy proceedings.... I believe this amendment, although a simple one, is necessary to protect the rights of debtors and to prevent misuse of the bankruptcy system as a tool of coercion.

*Id.* at 996 (quoting *In re Henry*, 52 B.R. 8, 9–10 (Bankr.S.D.Ohio 1985), which in turn had quoted 30 Cong. Rec. S7618 (June 19, 1984) (comments of Senator Baucus)). *See also In re Valdez*, 250 B.R. 386, 393 (D.Or. 1999) ("[t]he purpose of the not subject to a bona fide dispute requirement is to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt whether the basis is legal or factual so that the creditor may not use the threat of involuntary proceedings as a club against debtors who would rather pay up than suffer the stigma of involuntary bankruptcy proceedings"); *In re Ross*, 63 B.R. 951, 960–961 (Bankr.S.D.N.Y.1986) (Beatty, J.) ("the filing of an involuntary petition should not be a litigation tactic to force payment of a debt legitimately disputed").

The Court agrees with Century's observation [38] that the requirement that the debts not be the subject of a bona fide dispute is a debtor protection device, designed to prevent *creditors* from filing involuntary petitions against *debtors* against whom they have disputed claims, and here, by contrast, the Court is presented with a *debtor* that has sought bankruptcy protection, where "it is the very creditor whose presently due and owing $275 million claims threatens to force that debtor into liquidation." [39] The Court agrees with Century that "[t]o mechanically apply section 303(h)(1) in these circumstances," and deprive the debtor of bankruptcy protection, would run counter to the specific purpose of section 303(h)(1), and apply section 303(h)(1) in a way that is contrary to the debtor protection purpose which was the purpose of the 1984 amendments.

Plainly the ML Media debt has not been paid. The failure to pay it threatens a liquidation of the Cable Venture. The Court believes that it cannot disregard that debt in any analysis of whether the Cable Venture is generally paying its debts as they become due. A petition under the Bankruptcy Code by one of the Cable Venture's partners—even if, or especially if, the overriding purpose of such a petition is to invoke measures under the Code for the disallowance of that debt—is, in this Court's view, an understandable and acceptable basis for the filing of an involuntary petition under the facts presented here.[40]

38. Century Responding Br. at 28.

39. Century Responding Br. at 28.

40. With that said, the Court understands and respects that major differences continue between ML Media and Century with respect to the direction of the Cable Venture in its chapter 11 case. Here the Court is faced with two joint venturers who have significantly countervailing interests and yet, at least arguably, fiduciary duties to each other. Counsel for the Cable Venture has commented to the Court in section 105(d) status conferences with respect to uncertainties as to who should direct the affairs of the Cable Venture as a debtor in possession. The Court's determinations on this motion are without prejudice to any and all of ML Media's rights with respect to the governance of the Cable Venture going forward.

## C.

### Dismissal for Cause

ML Media argues that the Cable Venture's chapter 11 petition should be dismissed as a bad faith filing because Century "attempted to place the Joint Venture into bankruptcy solely as a litigation tactic and without reasonable likelihood that it intends to reorganize." The Court concludes, however, that dismissal would be inappropriate.

■■■ Bankruptcy Code section 1112(b) provides, in relevant part:

Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of the creditors and the estate, for cause . . .

11 U.S.C. § 1112(b). Determinations whether to dismiss or convert are within the discretion of the Court. *See, e.g., In re Woodbrook Associates,* 19 F.3d 312, 316 (7th Cir.1994); *In re Pleasant East Assoc.,* 286 B.R. 509, 516 (Bankr.S.D.N.Y.2002) (Gerber, J.); *In re Syndicom Corp.,* 268 B.R. 26, 43 (Bankr.S.D.N.Y.2001) (Gerber, J.).

■■■ While section 1112(b) states that the authority it provides—dismissal or conversion—may be granted for "cause," and lists one or more examples of cause, it precedes the list with the word "includes," and the list is not exhaustive. Cause for dismissal may be found based on unenumerated factors, including "bad faith," *see C–TC,* 113 F.3d at 1310 (affirming dismissal of case, under Code 1112(b), for bad faith filing), or failure to deal with creditors fairly even where "bad faith" is not found. *See In re Head,* 223 B.R. 648, 653

(Bankr.W.D.N.Y.1998) (Kaplan, C.J.) (dismissing chapter 11 and 13 cases for "non-enumerated" cause, by reason of unfair debtor practices). However, the burden is on the movant to prove bad faith, and dismissal for bad faith is to be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances. *See In re Syndicom Corp.,* 268 B.R. at 49 (*citing In re 234–6 West 22nd St. Corp.,* 214 B.R. 751, 757 (Bankr.S.D.N.Y.1997) (Brozman, C.J.)); *see also In re D & F Meat Corp.,* 68 B.R. 39, 40 (Bankr.S.D.N.Y.1986) ("it is well settled law that the burden of establishing cause for dismissal or conversion to Chapter 7 rests squarely on the party seeking such relief.") (citation and internal quotations marks omitted).

■■■ Over the years, a number of factors have been identified which may be indicative of a bad faith filing, and whose presence, or absence, has regularly been considered:

(1) the debtor has only one asset;

(2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6) the debtor has little or no cash flow;

(7) the debtor cannot meet current expenses including the payment of per-

sonal property and real estate taxes; and

(8) the debtor has no employees.

*C–TC*, 113 F.3d at 1311 (citing *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.*, 139 B.R. 828, 832 (W.D.Ky. 1992)); *See also Pleasant East*, 286 B.R. at 516–517 (listing and applying the *C–TC* factors). Examining those factors, some, but not all, are present here. The Court has found as facts:

(1) The Debtor has diverse assets, the two Systems, which are operating businesses, as compared and contrasted to, a single asset, such as is in single-asset real estate bankruptcies;

(2) ML Media's claim is unsecured, rather than secured, but the Debtor has at most very modest unsecured debt other than the debt owed to ML Media;

(3) The Debtor's assets are not the subject of a foreclosure action as a result of arrearages or default on debt, but are the subject of claims in pending litigation (now in this Court) between, *inter alia*, ML Media and the Debtor;

(4) The Debtor's financial condition is in large measure, if not totally, a two-party dispute between the Debtor, on the one hand, and ML Media on the other, with respect to the enforceability of the Recap Agreement, and, as related to that, the Debtor's contention that the duty of the Debtor (as contrasted to Century and/or Highland) to make pay-

ment to ML Media is voidable or void as a fraudulent conveyance;

(5) The timing of the Debtor's filing does *not* evidence an intent to delay or frustrate the legitimate efforts of ML Media to enforce its rights, as this litigation was ongoing, and would continue, irrespective of the Debtor's filing, or the timing thereof.

(6) The Debtor has substantial cash flow, though it does not have significant enough cash flow to pay a judgment in excess of $275 million without the sale of a major portion of its assets;

(7) The Debtor *can* meet current expenses;

(8) The Debtor has a considerable number of employees.

Factors #2 (the absence of significant debt to entities other than ML Media) and #4 (two-party dispute) more than modestly, and #3 (ongoing litigation between the Cable Venture and ML Media) modestly, support dismissal for cause (whether or not denominated as "bad faith filing").[41] However, the remaining factors cut the other way. More fundamentally, as the Court does not engage in a mechanical counting exercise, the Court believes that the Cable Venture's filing does not warrant dismissal for cause, as an overview of the Cable Venture's situation suggests that chapter 11 relief is warranted. The Cable Venture—not unlike Texaco, where the debtor faced a single large liability and filed a chapter 11 case, which went through to confirmation[42]—has a huge fi-

---

**41.** As noted in this Court's decision in *Pleasant East, see* 286 B.R. at 517 n. 34, this Court, since its decision in *Syndicom,* has preferred to save the appellation "bad faith filing" for the most egregious cases, and has preferred to characterize the basis for dismissal as "unenumerated cause," *see Head,* in cases where the *C–TC* factors dictate dismissal, but where there is greater justification for the filing. In either situation, however, the Court applies the *C–TC* factors, and where application of

those factors dictates dismissal, dismisses the case.

**42.** *See In re Texaco, Inc.,* 84 B.R. 893 (Bankr. S.D.N.Y.1988), where Texaco resorted to bankruptcy after suffering an $11 billion judgment, and where there was never a litigated motion in the Texaco case to dismiss on bad faith grounds. *See In re Sletteland,* 260 B.R. 657, 663 (Bankr.S.D.N.Y.2001) (Gropper, J.) Although Texaco found itself in its well-

nancial liability which it does not have the ability to pay out of current cash flow, and without a substantial liquidation of its assets. A number of courts have recognized as legitimate chapter 11 filings by other debtors in similar circumstances. *See In re Johns–Manville Corp.*, 36 B.R. 727, 736–37 (Bankr.S.D.N.Y.1984) (Lifland, J.) (denying a section 1112 motion to dismiss filed by asbestos tort litigants based on contention that Manville had filed its chapter 11 case as a maneuver to curtail its liabilities, *id.* at 734, noting that Manville was a viable business and "must not be required to wait until its economic picture has deteriorated beyond salvation to file for reorganization"); *In re Central Jersey Airport Services*, 282 B.R. 176, 181 (Bankr. D.N.J.2002) (motion to dismiss denied when solvent debtor filed in order to reject an executory contract which was being enforced in the pending litigation); *In re Chris–Marine U.S.A., Inc.*, 262 B.R. 118, 125 (Bankr.M.D.Fla.2001) (refusing to dismiss in bad faith where debtor was "a viable business with sufficient income to meet expenses, with numerous employees, and with good prospects for reorganiza-

tion" even though debtor's motivation was "to halt the accumulation of the [IRS's] contempt judgment" and to litigate the tax dispute before the bankruptcy court.) [43]

ML Media contends that "the Joint Venture's lack of a valid reorganization purpose is shown by the fact that the Joint Venture will not be able to confirm a plan of reorganization without the consent of ML Media, its largest creditor" and that the "Joint Venture's filing appears to be entirely based on the impermissible goal of gaining a tactical advantage in its pending litigation." [44] It may indeed be hard (or impossible) for the Cable Venture to confirm a plan without reaching an accommodation with ML Media, but that is not determinative at this time. There is no requirement in the Bankruptcy Code that the Cable Venture prove it can confirm a plan in order to file a petition. *See In re Brown*, 951 F.2d 564, 572 (3rd Cir.1991) (denying motion to dismiss filed "just a few weeks after the petition was filed" because "nothing in the record in the brief two months before denial or dismissal establishes that the [largest creditor] would

---

known difficulties as a consequence of a two-party dispute, and filed to avoid the imminent enforcement of a judgment against it, it had minimal debt in comparison to the judgment, considerable assets, substantial operating income, and employees to protect.

**43.** *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir.1999), is distinguishable. There, despite the debtor's unhappiness with the antitrust litigation that had been brought against it, it was not in any kind of financial distress as a consequence of that litigation, and in fact had issued a press release stating that was "financially healthy." It had a $240 million cash reserve, while the antitrust claims against it totaled $54 million—an amount large in absolute terms, but not significant relative to the cash on hand. The district court (sitting as a bankruptcy court) had found, as . facts, that the distraction of dealing with the antitrust litigation was having an adverse effect on the debtor's operations, but the Third Circuit

found that factual finding to be clearly erroneous. The district court had also found that the debtor had filed for bankruptcy relief at the appropriate time to avoid the possibility of a significant judgment that could "very well force [SGL Carbon] out of business," but the Third Circuit found this conclusion too to be clearly erroneous—"There is no evidence that the possible antitrust judgments might force SGL Carbon out of business." Here, on the different facts in this case, the Cable Venture does not have cash on hand sufficient to pay ML Media, and would face liquidation or dismemberment in the event of a judgment on the claim. This Court believes that here there is the requisite potential harm to the Cable Venture that would result from a judgment on the debt to ML Media, and believes that the Court's weighing of the Second Circuit's *C–TC* factors is sound.

**44.** ML Media Br. at 27–28.

reject all possible plans .... the evidence, then existing of bad faith was not strong enough to enable us to say that it was established as a matter of law."); *In re Lizeric Realty Corp.*, 188 B.R. 499, 503–04 (Bankr.S.D.N.Y.1995) (Garrity, J.) (denying motion to dismiss approximately three months after the filing of the petition because debtor had not yet proposed a plan, despite objector's argument that it could block confirmation of any proposed plan); *In re Toyota of Yonkers*, 135 B.R. 471, 476–77 (Bankr.S.D.N.Y.1992) (Schwartzberg, J.) (denying motion to dismiss as premature where debtor's only asset was a franchise agreement because "the debtor should at least be afforded the 120–day exclusivity period permitted under 11 U.S.C. § 1121(b) to propose a Chapter 11 plan" and the debtor had not yet proposed a plan).

## II.

### Abstention

ML Media finally argues that the Court should abstain from or dismiss the voluntary petition pursuant to section 305 of the Bankruptcy Code in favor of the state statutory wind-up process contemplated for partnerships in dissolution.[45] Section 305 of the Code, captioned "Abstention," provides, in relevant part:

> The court, after notice and hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
>
> > (1) the interests of creditors and the debtor would be better served by such dismissal or suspension.... [46]

Although it has the discretion to do so, the Court believes it should not abstain and dismiss the Cable Venture's case.

A motion under section 305(a) to "dismiss a petition or suspend the bankruptcy case is a form of extraordinary relief," *In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 524 (Bankr.S.D.N.Y.1996) ("*RCM*") (Brozman, C.J.); *In re Paper I Partners, L.P.* 283 B.R. 661, 678 (Bankr.S.D.N.Y. 2002) (Gerber, J.) (citing *RCM*), and abstention under section 305(a) is a power that should only be utilized under extraordinary circumstances. *Id.*, 283 B.R. at 678. *See also In re Grigoli*, 151 B.R. 314, 319 (Bankr.E.D.N.Y.1993) (Duberstein, C.J.) (denying a request for abstention by two creditors holding 55% of the estate's claims where the interests of the debtor and the creditors were best served through involuntary Chapter 7 case, and noting earlier authority that Congress had indicated that it intended section 305(a) dismissals to be the exception rather than the rule).

While no uniform test has been established in connection with determinations as to whether abstention is appropriate, early cases noted that three were relevant:

> (1) Whether the petition was filed by a small number of creditors and most creditors oppose the bankruptcy;
>
> (2) Whether there is a state insolvency proceeding or other out-of-court arrangement pending; and
>
> (3) Whether dismissal is in the best interests of the debtors and all creditors.

*See In re Trina Associates*, 128 B.R. 858, 867 (Bankr.E.D.N.Y.1991) (Duberstein, C.J.); *Paper I Partners*, 283 B.R. at 678 (citing *Trina Associates*).

Later cases enlarged the list of factors that would be considered. In this district, Chief Judge Brozman of this

---

45. ML Media Br. at 28–31.

46. A second basis for abstention, the pendency of a foreign insolvency proceeding, plainly is inapplicable here.

Court, in *RCM, see* 200 B.R. at 524, considered the broader set of factors considered by the court in *In re 801 South Wells Street, L.P.,* 192 B.R. 718, 723 (Bankr. N.D.Ill.1996). These factors were:

(1) economy and efficiency of administration;

(2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3) whether federal proceedings are necessary to reach a just and equitable solution;

(4) whether there is an alternative means of achieving an equitable distribution of assets;

(5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7) the purpose for which bankruptcy jurisdiction has been sought.

*See 801 South Wells,* 192 B.R. at 723. Of these, at least in this district, the first is a primary consideration. *See RCM,* 200 B.R. at 525.

 The Court considers it appropriate to analyze the issues here as did Judge Brozman, applying the *801 Wells Street* factors. Doing so here, the Court sees no basis for abstention. Taking them in order:

(1) Economy and efficiency of administration are served where the Court already has before it an adversary proceeding concerning the Recap Agreement, as to which the Court has already rendered four decisions, on ML Media's motion to remand ML Media's Recap Agreement claims against the non-debtors;[47] on ML Media's and Century's cross-motions for summary judgment;[48] on Highland's motion to dismiss ML Media's complaint;[49] and on ML Media's motion to compel assumption or rejection of the Recap Agreement;[50] This Court is intimately familiar with the underlying facts as to the parties' contractual arrangements, and has a substantial head start in understanding the economics of their relationship.

(2) There is no proceeding elsewhere, and no other forum has been shown available to protect creditor interests.[51] As the Court has now ruled, there was no dissolution of the Cable Venture, by reason of Century's filing under the Bankruptcy Code, and there thus is no alternative statutory process in favor of which this Court could abstain;

(3) Federal proceedings are at least desirable, if not necessary, for a just and equitable solution, where bankruptcy courts have considerable skill in evaluating the strengths, and weaknesses, of fraudulent conveyance contentions, and where some or all of the fraudulent conveyance claims would be premised on federal law;

(4) There is no apparent alternative means to achieve an equitable distribu-

---

**47.** *See ML Media I.*

**48.** *See ML Media II.*

**49.** *See ML Media III.*

**50.** *See Adelphia–Recap Agreement Assumption/Rejection Decision.*

**51.** The Court does not find persuasive ML Media's suggestions that "there is no more need for federal proceedings" because New York state courts will be able to address the New York state issues raised simply and efficiently.

tion of assets, for the reasons described above;

(5) There is no reasonable basis for a belief that efforts to work out a less expensive out-of-court arrangement would bear fruit, and any such settlement could just as easily be achieved here and now;

(6) No non-federal insolvency proceeding has been commenced at all, much less has it proceeded so far that it would be costly and time consuming to start afresh here; and

(7) The two principal purposes for which bankruptcy jurisdiction was sought—obtaining a "breathing spell" to protect against the enforcement of a claim that the Cable Venture cannot satisfy out of current cash flow, and the determination of whether, from the Cable Venture's perspective, the Recap Agreement was a fraudulent conveyance under federal bankruptcy law—are matters for which invocation of the bankruptcy laws is hardly inappropriate.

In short, there is nothing in the facts here warranting the "extraordinary relief," *RCM,* 200 B.R. at 525, of abstention under section 305.

### Conclusion

For the Foregoing reasons, ML Media's motion to dismiss the Cable Venture's chapter 11 case, or alternatively, for an order abstaining from hearing the case, is denied.

SO ORDERED.